## CATOE v. UNITED STATES.
### No. 8090.

United States Court of Appeals for the District of Columbia.

Decided Oct. 5, 1942.

Mr. Walter M. Shea, of Washington, D. C., with whom Messrs. George J. Boden and John T. Bonner, both of Washington, D. C., were on the brief, for appellant. Mr. J. Robert Esher, of Washington, D. C., also entered an appearance for appellant.

Mr. Bernard Margolius, Assistant United States Attorney, of Washington, D. C., with whom Messrs. Edward M. Curran, United States Attorney, John W. Fihelly, and Charles B. Murray, Assistant United States Attorneys, all of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, and VINSON and RUTLEDGE, Associate Justices.

VINSON, Associate Justice.

Appellant (defendant) was convicted of murder and rape. On the latter count, the jury's verdict included the death penalty.[1]

Nearly all of the evidence proving both the crime and the defendant the perpetrator comes from his oral admissions against interest and his written confession. We summarize the substance of his statements. The victim opened a conversation with defendant on the sidewalk outside of her apartment. She asked defendant if he would do some work for her, since she could not find the janitor, and since she was in a hurry to have the apartment looking better before company came. They went up to the apartment. The woman asked defendant how much he would charge to wax the floors. He said that he would not have time that day because he had to be at work at eleven o'clock. Then she took him to the bathroom and asked him if he could fix the spigots. Defend-

[1] D.C.Code (1940 Ed.) § 22—2801.

ant said that she would have to get a plumber for that work. Meanwhile the victim had indicated that her husband would not be home until after one o'clock. The woman returned to the kitchen with the defendant behind her. Again she asked about waxing the floors. This time defendant made no response but grabbed her by the neck. After carrying and dragging her into the living room, he threw her down on the day bed, ripped her pants off, choked her when she struggled, and had forcible sexual intercourse with her. When he had finished he choked her some more so she would not scream too soon, rearranged her clothes to some extent, took a $20 bill out of a black leather pocketbook, and went out of the apartment off to work.

Defendant in no way questions the sufficiency of this evidence. He relies rather upon the claim that the oral admissions and written confession should not have gone to the jury because they were involuntarily given.

Against this claim stands the sequence of events revealed by the Government's case and by its testimony before the Judge prior to his ruling that the admissions and confession should go to the jury. The testimony before the Judge and that which went to the jury are substantially the same except that before the Judge other offenses allegedly committed by defendant were discussed. In this way the relation of defendant's confession of this crime with his confession of others was shown to the Judge but not to the jury. We now present the substance of the Government's testimony.

The crime was committed on March 8, 1941. On August 28, around 8:30 a.m., defendant was arrested. At first defendant was held solely for questioning by New York officers in connection with a New York crime. During the day it developed that defendant might be involved in several local offenses. Around 10:30 p.m., after detailing several attacks upon colored women subsequent to being identified six or seven times in the evening line-up, defendant was asked whether he had anything to do with recent attacks on white women. He mentioned one such crime. After some discussion of that crime, at around 11:00 p.m., he brought up the instant offense.[2] Whereupon he made statements which fully established his guilt if voluntary and if believed. He stated, for example, that he had taken a $20 bill from a black leather pocketbook, which fact was known until that time by only two officers.

Later that night defendant was taken to reenact the crime which he admitted around 10:30, just prior to his statement concerning the instant one. This trip ended around 3:00 a.m., and defendant got to bed around 4:00 o'clock.

The next morning (August 29th) around 10:30, defendant led the officers without assistance to and into the apartment where this crime was committed. It would be necessary for one to know the building to lead others to this particular apartment. Defendant reenacted the crime, described the furniture which had been removed, and again stated that he had taken a $20 bill from a black leather pocketbook.

About an hour later, back at the police station, defendant made a full written confession in two parts. First, there is the defendant's narrative. Second, there is his response to questions which for the most part are nonleading. This confession recites substantially all of the facts which we stated at the outset.

The next night (August 30th) around 9:30, defendant was examined by a doctor, the Coroner for the District of Columbia, at the instance of the police. There were no bruises, cuts, or any other indication of physical mistreatment. Defendant admitted to the Coroner, the police being present, that he had been given enough to eat, that he had slept pretty well, and that he had been treated from "all right" to "very nice".

On August 31st, with an officer always present, defendant had at least four visitors, including his brother. He admitted that the police had fed him, had treated him nice, that he had told the truth, that what he did he did alone, that he did not want an attorney, and that he wanted them to pray for him.

In this connection, during the thirty critical hours following the arrest, the police testified with unanimity of conclusion

---

[2] The testimony of the officers that defendant initiated the discussion of this murder-rape in response to a general question which in effect asked him, "any other crimes", was unanimous except for that of one detective from New York who said that around 9:30 a. m. on August 28th he overheard the Washington officers questioning defendant in respect of this crime and one other.

but with difference of detail that defendant had sufficient sleep, that he never appeared fatigued, that they saw him eat three or four times and that food was probably left for him under the usual routine two other times. The police also testified that the questioning was intermittent, that it was carried on in normal tones, and without tricks or force, and that the defendant at no time showed nervousness or fear. The police vehemently denied any use of any third degree.

A month later at a sanity examination conducted by two doctors representing the Government and two doctors appointed by defendant's counsel, after being warned about making statements against interest, defendant denied in response to questions by the doctors any connection with, or knowledge of, this case except that which he had learned since arrested. A week later at a second similar examination defendant told the doctors, after being warned again, that part of what he had said at the previous examination was untrue. He then explained that he knew the layout of the apartment because an acquaintance of his had gone there, drugged a woman, and that he, the defendant, had taken a camera up so that the acquaintance could take some pictures of the woman in the nude. He said that he was in the apartment a short time and saw the woman in a fleeting glimpse through a door that was ajar. Defendant did not know whether his acquaintance had killed the woman, and did not report the incident because he had been a police informer in the past and was of the belief that innocent men often get into a jam.

Against these statements of defendant showing his guilt and this evidence that the statements were made freely, stand defendant's testimony at the trial and his claim of mistreatment by the officers. At the trial defendant gave a practically uncorroborated alibi,[3] denied all connection with the crime or woman, and stated that he knew nothing of the apartment until he was led there to reenact the crime.

Defendant attempts to explain his first oral statements made around 11:00 p.m. on August 28th on the grounds that he was sleepy, hungry, and ill, and that the officers threatened him while putting words in his mouth. He attempts to explain the reenactment of the crime the next morning on the bases that he was led to the apartment and asked leading questions while still afraid. He explains the written confession on the grounds that he had been slugged, although he could not place the time, that he was afraid, and that he signed twenty-five or so papers without reading them. He claims that he was afraid to tell the Coroner the truth the next night because officers were present, and that his body disclosed no evidence of brutality because policemen know how to hit you. Likewise, he explains his failure to complain to his brother and friends when they visited him because police were present. When asked whether he told the doctors at the second mental examination the narrative related above his only response to a series of questions was that he did not know and did not remember.

The Judge had a large amount of testimony upon which to conclude that the issue of voluntariness was for the jury. The record shows that as much or more testimony was taken before him, in the absence of the jury, as was subsequently taken before the jury.[4] There was defend-

---

[3] Defendant testified that he had to walk to work, and that he arrived there at 10:15 a. m. in order to eat and change his clothes before going on duty at 11:00 o'clock. His brother said that defendant's car was not running that day and the employer's work sheet showed defendant on duty that day starting at eleven. This, of course, did not make it impossible for defendant to be a few blocks away at the scene of the crime a few minutes earlier. The Government's evidence places the time of the crime around 9:30 to 10:00 a. m. A tenant in the apartment below testified that he heard a scuffle, screams, and footsteps from the kitchen to the living room within that

period of time. The doctor examining the body around 10:00 p. m. said death had occurred twelve to fifteen hours previous. Defendant stated in his confession that he had left home at 9:25 a. m. The scene of the crime was two to three blocks from his home. Thus the "alibi" almost corroborates the Government's case, except for the blank statement that he was not there.

[4] In fact the record bulks larger in respect of the testimony before the Judge because of the discussion of other crimes to which we have referred. Also the evidence was spelled out a little more before the Judge, and the witnesses had become somewhat more concise on their second

ant's testimony, corroborated to a small extent by his brother, that the confession and oral statements were involuntary. The brother testified that defendant winked at him when he answered "Yes" to a policeman's question if he had been treated all right. He also testified that the policemen said that defendant had not been fed. The evidence, however, that defendant's statements were voluntary preponderated both as to bulk and weight. The evidence that the confession was forced was far from being highly persuasive. From the whole one gains the impression that while defendant probably did not eat as well as he might have on the outside, that while he did not receive an abundance of sleep, and that while he was questioned a lot at different times, he probably received sufficient nourishment, a fair opportunity to sleep, and was never so fatigued, or injured, or ill, or afraid, as to cause involuntary statements against interest. If the officers are believed at all the admissions and confession could only be excluded on the ground that police cannot question suspects and use their answers against them.

 In this jurisdiction the rule is that where there is evidence upon which it could be concluded that the confession is voluntary, the confession is to go to the jury under proper instruction.[5] While confessions that may be involuntary are to be scrutinized zealously,[6] the record clearly reveals that the issue was for the jury in this instance. We conclude that there was much more than sufficient evidence to find the confession and admissions voluntary. The issue went to the jury errorlessly.

The Judge carefully instructed the jury that they were to pass upon the issue of voluntariness before they considered the confession and statements, and that even if they concluded that they were voluntary they did not have to conclude that defendant was guilty. There is no argument with the instructions.

Defendant makes one further argument.

It is that the two doctors who represented the Government at the mental examination could not testify under our Code provision: "In the courts of the District of Columbia no physician or surgeon shall be permitted, without the consent of the person afflicted, or of his legal representative, to disclose any information, confidential in its nature, which he shall have acquired in attending a patient in a professional capacity and which was necessary to enable him to act in that capacity, whether such information shall have been obtained from the patient or from his family or from the person or persons in charge of him: Provided, That this section shall not apply to evidence in criminal cases where the accused is charged with causing the death of, or inflicting injuries upon a human being, and the disclosure shall be required in the interests of public justice."[7]

 While this Court has held that the full spirit of this Act shall be made effectual,[8] this case probably is not within the intendment of the exclusion.[9] The type of evidence that is not admissible is that which is given in confidence by a patient to a doctor. It protects the personal nature of an ordinary patient-doctor relationship. In contrast, in this case, four doctors, two representing each side, examined the defendant in connection with a probable prosecution. Defendant took no ailment or complaint to them as his doctors. Defendant was told the circumstances of the examination and was warned against making statements that might be to his detriment.

Not only is this testimony probably not within the principle of the main rule making the exclusion, but it is clearly within the exception which retains the usual admissibility characteristic of evidence. The accused is charged with the death of, and with inflicting injuries upon, a human being. Thus even his own doctor could have been called upon to testify, if the interests of public justice required it. The application of this criterion, "public jus-

---

appearance which was before the jury. At any rate the Judge had more than an adequate basis to decide that the issue of voluntariness was for the jury.

[5] McAffee v. United States, 70 App.D. C. 142, 105 F.2d 21; McAffee v. United States, 72 App.D.C. 60, 111 F.2d 199.

[6] See Bullock v. United States, 74 App. D.C. 220, 122 F.2d 213. Compare Lisen-

ba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166.

[7] D.C.Code (1940 Ed.) § 14—308.

[8] Eureka-Maryland Assurance Co. v. Gray, 74 App.D.C. 191, 121 F.2d 104.

[9] Compare Skidmore v. State, 59 Nev. 320, 92 P.2d 979, and People v. Sliney, 137 N.Y. 570, 33 N.E. 150.

See Eureka-Maryland Assurance Co. v. Gray, 74 App.D.C. 191, 121 F.2d 104.

tice", is a matter of discretion with the trial judge. It is presumed that he exercised it, when he overruled defendant's objection. There was nothing that approached abuse.

The record indicates that defendant has been subject to no error which he does not allege, and those which he alleges are without merit.

Affirmed.