Commonwealth *v.* Sykes, Appellant.

Argued November 26, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Raymond Pace Alexander,* with him *John W. Lord, Jr.,* for appellant.

*Ephraim Lipschutz,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellee.

OPINION BY MR. JUSTICE HORACE STERN, January 7, 1946:

Defendant, a young woman 20 years of age, was the perpetrator of an extremely cruel, cold-blooded and atrocious murder. She had gone to an employment agency, where, by fraudulently impersonating one of her acquaintances and giving a false reference, she succeeded in being directed to the home of Mrs. Freda S. Wodlinger, who was in search of a maid. Mrs. Wodlinger, a public school teacher, was a woman 45 years of age. Two days after entering her service defendant took from the kitchen a carving knife, 12 inches long with an 8 inch blade, wrapped it in a dust-rag, went upstairs where Mrs. Wodlinger was dressing and stabbed her viciously in the chest, back, head and face, causing deep wounds and such severe hemorrhages that her victim died almost immediately. She then wrenched from Mrs. Wodlinger's finger a diamond engagement ring and a wedding band and took from an adjoining room furs, another ring and $50 in cash. She was arrested several

days later. Pleading not guilty, she was tried before a jury and convicted of murder in the first degree with the penalty of death.

The facts of the case were practically all admitted by defendant, her counsel frankly stating at the trial that his only object was to save her from the death penalty. For this purpose reliance was placed upon two "defenses"—one, that she was pronounced by the psychiatrists who examined her to be a constitutional psychopathic inferior, and, according to her school records, she had a mental age of 7 years 9 months at a time when she was in fact nearly 13 years old; the other, that she had been living during the preceding six months with Jaycee Kelly, a notorious bootlegger with a long criminal record, who had induced her by overpowering influence, dominance, threats and intimidation, to engage herself at Mrs. Wodlinger's for the purpose of stealing whatever valuables she could find there and turning them over to him; she therefore claimed that she did not act as a free agent in the perpetration of the crime. These alleged facts were presumably considered by the jury, but, as the verdict indicates, to no avail as far as defendant was concerned.

Several assignments of error on the present appeal are based upon complaints that defendant's counsel was interrupted from time to time in his closing address to the jury either by the assistant District Attorney who tried the case or by the court, and that in several such instances the remarks of the latter seriously prejudiced counsel's presentation of his client's cause. Thus, counsel was stopped by the court while engaged in arguing to the jury that capital punishment had not proved itself a deterrent to the commission of crime, that it had been entirely discarded by several States and made optional in others, and that the Pennsylvania legislature at that very time had under consideration a bill to abolish it altogether. The court was justified in prohibiting such a discussion. The law of the State must be administered as it presently exists, and it still provides for capital

punishment as a penalty in appropriate cases. In cautioning counsel in reference to his argument on this subject the court said, "If you emphasize this point I will have to speak about it to the jury. I will have to tell the jury about a life sentence."[1] Presumably what the court had in mind was that persons sentenced to life imprisonment are frequently paroled after serving a number of years; to have stated this to the jury would have been of doubtful propriety, but as the court's announced "threat" was not carried out no harm could possibly have resulted.[2]

On another occasion the address of defendant's counsel was halted when he waved a book in front of the jury, told them its author was Lewis E. Lawes, a former warden at Sing Sing prison, and that it was shown in this book that the number of murder cases had decreased in States which had abolished capital punishment. It was within the discretion of the court to rule out such a reference to Mr. Lawes' views, and we cannot say that that discretion was abused. Counsel relies upon a statement by Mr. Justice (now Chief Justice) MAXEY, in *Commonwealth v. Brown*, 309 Pa. 515, 522, 523, 164 A. 726, 728, 729, that "The judge in his charge and counsel in their arguments have the right to use illustrations from history or literature or any other stock of common knowledge."[3] Obviously, the "illustrations from history,

---

[1] Counsel for defendant claims that what the court actually said was: "I will have to tell the jury about *the average length* of a life sentence." Even if this be the correct version we would still be of opinion that its ineptitude was not so serious as to occasion harm to defendant.

[2] We do not approve of the decision in *State v. Mosley*, 102 N. J. L. 94, 131 A. 292, holding that it was not erroneous for the court to instruct the jury that one of the elements to be considered by them in determining the penalty was whether a sentence of life imprisonment could be disregarded and set at naught by the court of pardons and that life prisoners who observed the rules of the institution and served not less than 15 years might be released on parole.

[3] To this Mr. Justice MAXEY added: *"but they are not privileged to testify unless they assume formally a witness's role."*

literature or any other stock of common knowledge" were meant to refer only to universally recognized and accepted works of literature or science, a limitation which would scarcely include treatises such as that of Mr. Lawes.

Defendant's counsel was interrupted again when he told the jury that if defendant were placed in an institution for the rest of her life "we will never . . . . ask any tribunal for any mercy." Such a promise, however sincerely intended, was clearly not a proper one to present to the jury for the purpose of influencing their decision. The court was also justified in rebuking counsel for stating to the jury "you have probably read in the papers certain evidence in the case" and in correcting him when he spoke of the jury's exercising "the prerogative of taking human life," the court declaring that "The jury doesn't take human life; they impose a penalty."

Counsel told the jury that the court would charge them in regard to any reasonable doubt on their part concerning the penalty. The court thereupon interjected: "The question of reasonable doubt does not go as to the matter of punishment." This was a correct statement of the law: *Commonwealth v. Curry*, 287 Pa. 553, 558, 135 A. 316, 317.

There are assignments of error complaining of observations made by the learned trial judge in his charge to the jury. One such remark, obviously in jocular vein, ridiculed some of the evidence which had been presented as to defendant's mental backwardness during the years of her childhood; another was in reference to testimony that her limited mentality was such as could not likely be developed, the court saying: "If punishment . . . is to be considered from the angle of the reformation of the person who commits the crime, then you may consider what reform is possible, even in a penal institution, of a person who cannot be developed." There was justification for the court's cautioning the jury not to be im-

pressed too readily by the evidence as to the low grade of defendant's mentality, for, from the very inception of the crime to its consummation, she displayed such cunning and ingenuity in carrying out her wicked purpose as fairly to overcome the attempt to represent her as psychopathic or mentally sub-normal. While we cannot approve of facetious observations on the part of the court, especially in a murder case, which tend to belittle testimony presented by a defendant, and while we would suggest that if the attention of the jury should be called to the improbability or the weakness of such testimony this purpose should be effected in a manner consistent with the seriousness of the issue, the remarks complained of in the present instance did not, in our opinion, harm defendant's cause to an extent constituting reversible error. And although the learned trial judge may, by some of his remarks, have indicated to the jury his own opinion as to the penalty which should be imposed, he emphasized to them that the question was one for their determination alone; he said that "The matter of punishment is exclusively for you." It has several times been held that the trial judge may express an opinion as to the penalty to be inflicted in a homicide case provided he leaves the jury absolutely free to fix the penalty regardless of his own point of view: *Commonwealth v. Nafus*, 303 Pa. 418, 421, 154 A. 485, 486; *Commonwealth v. Stabinsky*, 313 Pa. 231, 234, 169 A. 439, 440; *Commonwealth v. Edwards*, 318 Pa. 1, 6, 178 A. 20, 22; *Commonwealth v. Gable*, 323 Pa. 449, 455, 187 A. 393, 396.

Dr. Frederick S. Baldi, Superintendent of the County Prison of Philadelphia, testified that, in response to a request of defendant, he visited her in the chief matron's office and she told him that "she was sorry for the way she had acted and fooled the doctors"—evidently referring to the psychiatrists who had examined her. Complaint is made of the admission of this evidence on the ground that her communication was privileged because,

as an inmate of the prison, she was a "patient" of Dr. Baldi. There are several reasons why such a contention is without merit. At common law a physician was not disqualified from testifying to information acquired by him while attending the patient in a professional capacity and, as far as the Act of June 7, 1907, P. L. 462, is concerned, that statute applies only to civil cases: *Commonwealth v. Edwards*, 318 Pa. 1, 6, 7, 178 A. 20, 22, 23. It may be added that Dr. Baldi was summoned by defendant, not to render service as a physician, but in his capacity of Superintendent of the prison, and therefore the rule of evidence invoked could not possibly apply.

Finally, it is urged by defendant's able counsel that a new trial should have been granted because of allegedly after-discovered evidence. In an affidavit presented to the court he alleged that, after the jury had retired, he learned that the Commonwealth had obtained a written confession from Kelly that he had had possession of the stolen furs and had burned them in the furnace in his home, a fact which the Commonwealth had suppressed at the trial. It is contended that if the jury had known this it would greatly have strengthened defendant's position that the robbery had been planned and instigated by Kelly, that she had carried it out merely on his behalf and under his domination, and that he alone had received the proceeds of the theft. We find no abuse of discretion in the court's refusal to grant a new trial on this ground. Kelly on the witness-stand did not deny that he had had the furs in his possession but only that he had received them from defendant, and this was not in conflict with her own statement that she had placed the stolen articles in the room which she shared with Kelly and that he presumably had found them there and taken possession of them. He was asked on cross-examination: "And you say you did not get the furs?" to which he replied, "I did not—*from her.*" Apparently counsel did not note the significance of the qualification

contained in this answer; had he pursued the examination he might have obtained from Kelly the same admission as that contained in his statement to the police. It cannot be said, therefore, that the evidence was such as could not have been obtained at the trial by the exercise of reasonable diligence. Moreover it would serve, at best, merely to corroborate defendant's testimony and to impeach Kelly's credibility. Nor is it likely that it would bring about a different verdict if a new trial were granted, because, even if the jury were to believe that Kelly had instigated and planned a larceny and had coerced defendant into committing it, there is not a word in defendant's testimony indicating any claim on her part that Kelly had suggested to her she should commit either a robbery or a murder; all that she asserted was that he had told her he was in dire need of money and that she should gain employment somewhere for the purpose of stealing whatever she could find there of value and bringing the spoils to him.[4] The murder which defendant committed was wholly unnecessary for the accomplishment of any such thievery; it was a senseless, brutal crime, and was committed entirely on her own account and because of her own savage impulses. For all these reasons the fundamental requirements for granting a new trial on the ground of after-discovered evidence are here wholly lacking: *Hornick v. Bethlehem Mines Corporation,* 310 Pa. 225, 228, 165 A. 36, 37; *Felo v. Kroger Grocery & Baking Co.,* 347 Pa. 142, 146, 31 A. 2d 552, 554; *Brannagan v. Great Atlantic & Pacific Tea Company,* 352 Pa. 18, 20, 21, 41 A. 2d 869, 870.

The judgment and sentence are affirmed and the record remitted for the purpose of execution.

---

[4] Kelly has been tried for receiving stolen goods and as accessory after the fact of murder, has been found guilty, and has been sentenced to five years in the county prison, where he is now confined.