MICHAEL SCOLAVINO, an Infant, by ANTHONY SCOLAVINO, His Guardian ad Litem, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 27647.

Court of Claims, May 6, 1946.

*M. M. Leichter* and *Henry Crant* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Harold S. Coyne* of counsel), for defendant.

Lounsberry, J. This is a claim against the State of ·New York based on the alleged negligence of ·the State and its employees, arising out of an assault committed on March 30, 1943, against the claimant, Michael Scolavino, an inmate of the Harlem Valley State Hospital, by John Benturira, another inmate.

The Harlem Valley State Hospital, located at Wingdale, New York, is owned and operated by the State of New York for the observation, treatment and care of the mentally ill. Both the claimant and Benturira had been patients at this institution for some years prior to the assault, claimant with a diagnosis of psychosis with mental deficiency, and Benturira with a diagnosis of psychosis and epileptic clouded states.

On the date of the assault, both individuals had been confined to their beds by means of restraint sheets in a room known as the restraint room which formed part of a ward known as the disturbed ward, reserved for the care of the more violent inmates. At about a quarter of two o'clock in the morning of March 30, 1943, Benturira succeeded in breaking out of his restraint sheet and brutally attacked the claimant, Scolavino, who was still confined in his restraint sheet and unable to defend himself. As a result of this attack, the claimant was rendered permanently blind, and also suffered a fractured nose and various bruises.

Upon the trial, the claimant endeavored repeatedly to introduce into evidence various portions and all of the hospital records of Benturira, contending that this record would clearly establish that the officers and employees of the hospital well knew that Benturira was of a violent and assaultive disposition,

and that he had escaped from restraint sheets on several occasions. The conclusion sought to be drawn, of course, was that in the light of this knowledge the officers and employees were negligent in permitting these two inmates to be confined in the same room without special precautions. The State objected strongly, however, to the introduction of this record, or any part thereof, on the ground that its contents were privileged communications between the hospital physicians and their patient, within the meaning of section 352 of the Civil Practice Act. This court reserved decision as to the admissibility of such records and the same were marked for identification.

At the conclusion of the trial counsel for claimant inadvertently neglected to renew his previous offers in evidence of said record, and of specified portions thereof, being claimant's exhibits for identification 5, 6, 7, 16, 17, 19, 21 and 22. On August 2, 1945, he moved that the trial be reopened for the sole purpose of amending the transcript thereof to show that he had renewed his offer of said exhibits; that the State had objected thereto, and that the court had reserved decision thereon. This motion is granted, and it is ordered that the transcript of the record of the trial be deemed amended accordingly.

The important question remains whether or not the records in question are admissible in evidence. Section 352 of the Civil Practice Act provides, in substance, that a physician shall not be allowed to disclose any information he acquired in attending a patient in a professional capacity and which was necessary to enable him to act in such capacity. It is true that the records in question were based on observations of the patient made by physicians, but it does not necessarily follow that the relationship of physician and patient, within the intention of section 352, existed. In fact, it has already been held that this professional relationship does not exist between the official physicians of a State hospital and its inmates. In *Liske* v. *Liske* (135 N. Y. S. 176) decided under section 834 of the Code of Civil Procedure, which is now section 352 of the Civil Practice Act without substantial change so far as this case is concerned, the court stated (p. 178): " The public policy of the state demands the maintenance of such institutions and the care and treatment of the inmates, which necessarily involve their medical examination. I do not think that the relation arising by operation of law between a patient committed by legal process to a state institution for the insane

and the official physicians in charge thereof is within the professional relation contemplated by section 834 of the Code of Civil Procedure, or that such section was designed to exclude the testimony of such official physicians, whose duty it is under the police power of the state to make physical examinations of irresponsible patients. The purpose of the protection being here absent, the legislative enactments as to the duties of medical officers in the state institutions for the insane, and as to the making of public records relative to their condition, indicate that the testimony objected to was properly admitted."

The same conclusion was reached in *Munzer* v. *Blaisdell* (183 Misc. 773) which involved the disclosure of the record of an inmate by the superintendent of a State hospital to a stranger. After her release, the inmate brought action against the superintendent, but the court held, citing *Liske* v. *Liske* (*supra*) that there was no cause of action since the professional relationship of physician and patient did not exist.

Wigmore, in his work on Evidence (Vol. 8, 3d ed., § 2285) sets forth the following four fundamental conditions necessary to the establishment of a privilege against the disclosure of communications:  (1) the communications must originate in a confidence that they will not be disclosed; (2) such confidence must be essential to the satisfactory maintenance of the relationship; (3) the relationship must be one which ought to be sedulously fostered, and (4) the injury resulting from disclosure must be greater than the benefit disclosure would afford in disposing of litigation correctly.

The privilege here asserted by the State fails to meet any of these tests, excepting the third. It is extremely dubious that John Benturira considered any communications to the hospital physicians, or any observations made by them, as confidential, and it is difficult to see how either confidentiality or its lack would affect the relationship between such physicians and a mentally deficient patient. Further, any conceivable injury to such relationship resulting from disclosure of the records at this trial is certainly outweighed by the value of such disclosure in arriving at an informed decision in the case.

Even assuming that the privileged relationship of physician and patient might exist in such an institution, however, an exception to the privilege appears to be provided by section 84 of the Mental Hygiene Law▮ which read as follows (italics supplied):  " § 84. ENTRIES IN CASE RECORD. Every director

or other person in charge of an institution for the care and treatment of the mentally ill, shall, within three days after the reception of a patient, make, or cause to be made a descriptive record of such case. He shall also make or cause to be made entries from time to time, of the mental state, bodily condition and medical treatment of such patient during the time such patient remains under his care, and in the event of the discharge or death of such person, he shall state in such case record the circumstances thereof, and make such other entries at such intervals of time and in such form as may be required by the commissioner. Such record shall be accessible only to the director and such officers and subordinates of the institution as he may designate and to the commissioner and his representatives, *except on the consent of the commissioner or an order of a judge of a court of record.*"

Certainly, in the light of this section, the hospital records of an inmate of a State institution for the care of the mentally ill enjoy no such absolute privilege against disclosure that only the patient can waive it, as is now contended by the State. The section clearly provides that such records may be disclosed to anyone, without consulting the patient, on the consent of the commissioner or upon the order of a court of record.

On March 13, 1944, this court made an order, on the claimant's motion, directing the State of New York, through its physicians and employees of the Harlem Valley State Hospital, to submit to an examination before trial with respect to, among other things, the diagnosis, treatment, care and conduct of John Benturira and also directing the State to submit, for discovery and inspection by the claimant and his attorneys, substantially all of its record relating to the same matter. This order of examination and discovery, insofar as it related to the record of John Benturira, was such an order of a court of record as is contemplated by section 84 of the Mental Hygiene Law.

By virtue of this order the evidence now sought to be excluded was fully disclosed to the claimant's attorneys and all other persons present at the examination before trial and the discovery and inspection which were subsequently conducted. Thereafter it was too late to recall it. " There can be no disclosure of that which is already known, for when a secret is out it is out for all time and cannot be caught again like a bird and put back in its cage." (*People* v. *Bloom*, 193 N. Y. 1, 10.) " The nature of the information is of such a character that when it is once divulged in legal proceedings, it cannot be again

hidden or concealed. It is then open to the consideration of the entire public, and the privilege of forbidding its repetition is not conferred by the statute." (*McKinney* v. *Grand Street R. R. Co.*, 104 N. Y. 352, 355.)

At the time when this order was under consideration the State not only did not oppose but consented to those portions thereof concerning the examination and inspection with respect to Benturira, and did subsequently submit to a lengthy and detailed examination before trial with respect to the diagnosis, treatment, care and conduct of John Benturira and did submit for inspection all of the now disputed records concerning him. No question of privilege with respect to such records was raised by the State at the time when the order was granted, no appeal was taken from the order, and no objections to any questions concerning Benturira were made during the examination.

Such conduct on the part of the State would seem to amount to a waiver of the right to claim the benefit of the privilege. It seems adequately established that waiver of the privilege may be implied as well as expressed; that it may be implied from conduct not only at the trial but also in an examination preliminary thereto, and that voluntary disclosures upon such a preliminary examination may be given the same effect as formal waiver on the trial. (*Munzer* v. *Swedish American Line*, 35 F. Supp. 493; *Clifford* v. *Denver & R. G. R. R. Co.*, 188 N. Y. 349; 8 Wigmore on Evidence [3d ed.], § 2388.) A waiver may be implied where the conduct of the party asserting the privilege has placed the adverse party in such a position with respect to the evidence that it would be unfair and inconsistent to permit retention of the privilege. (8 Wigmore on Evidence [3d ed.], § 2388.)

It is difficult to view the position of the State on this issue as other than unconscionable. The State, as defendant, seeks, as physician, to invoke a privilege asserted to belong to its patient, John Benturira, in order to exclude clearly relevant evidence reflecting on the care given by it to another patient, Michael Scolavino. It does not do this to protect Benturira, but to protect itself. Surely the privilege afforded communications between physician and patient was never intended to be used in this manner. In this case the evidence is chiefly within the control of the State and its employees. If important portions thereof can be excluded on the ground of privilege, the State enjoys an advantage over private litigants which is unjust and indefensible.

We conclude, therefore, that the relationship of physician and patient does not exist between State hospital physician and mentally deficient inmate to the extent that communications between them are absolutely barred from disclosure by section 352 of the Civil Practice Act; that such privilege as may exist under some circumstances is limited by section 84 of the Mental Hygiene Law; that the order of examination and discovery granted by this court amounted to such an order of a court of record permitting disclosure as is contemplated under such section; that the ensuing examination resulted in a complete and irrevocable disclosure of the evidence now sought to be excluded; that in any event the State has waived its right to assert the privilege; that its recognition in this case would be an unwarranted injustice to the claimant; and that, therefore, the disputed hospital record and all portions thereof are properly admissible in evidence. This includes Exhibit 20, a letter from the superintendent of the hospital to an official of the Department of Mental Hygiene, and Exhibits 21 and 22, which comprise a letter from the superintendent to an investigator of the Department of Law. If these items were entirely separate from the other records, they might stand on a different footing, but both letters are included in the hospital record of John Benturira. We admit them as part of that record.

Turning now to the evidence, we find that on the date of the assault there were sixty-six patients in the disturbed ward, which consisted of eight dormitories and twenty single rooms, that five patients were confined to the dormitory known as the restraint room, in restraint sheets, and that only two attendants were on duty in this ward, only one of whom was assigned to the half of the ward which included the restraint room. No effort was made to keep the patients in the restraint room under constant observation. It was the practice of the attendants to make rounds at about half-hour intervals, but these varied considerably, and there were apparently no written regulations governing the matter. At the time of the assault the nearest attendant was some sixty feet away, in the dayroom, where he could not possible watch conditions in the restraint room. Apparently somewhat more than thirty minutes had elapsed since the last inspection. No attendant knew of the assault until it was fully completed.

It was well known to the hospital physicians, officers and attendants that John Benturira was a strong man, and was of a violent and assaultive disposition; that he had attacked attendants and patients on previous occasions; that it had frequently been necessary to place him in restraint; that he

had on several occasions escaped from restraint sheets, and that there was bad feeling between him and the claimant. Nevertheless, both patients were confined in the same room with only five feet separating their beds and no special precautions were taken to guard against the occurrence which obviously could and did happen.

The particular restraint sheet from which Benturira escaped evidently disappeared, a result probably of the policy or lack of policy revealed by the testimony with respect to the maintenance of these important protective devices. It was the testimony of the attendants that when restraint sheets were found to be weak or otherwise defective they were simply returned to the same closet where the other restraint sheets were kept, instead of being segregated, and that at times defective restraint sheets were used for lack of any other.

. It was clearly the duty of the hospital to afford its inmates every reasonable care to protect them from injury, either self-inflicted, or otherwise. The degree of such care is measured by the patient's physical and mental ailments as known to the hospital officials, physicians and employees. (*Shattuck* v. *State of New York*, 166 Misc. 271, affd. 254 App. Div. 926; *Weihs* v. *State of New York*, 267 App. Div. 233.) In the latter case provision of four attendants for sixty-nine patients of known violent tendencies was held insufficient care, and in *Dimitroff* v. *State of New York* (171 Misc. 635), provision of two attendants for some fifty-eight or sixty patients was deemed negligence. To the same general effect are *Martindale* v. *State of New York* (269 N. Y. 554) and *Luke* v. *State of New York* (253 App. Div. 783). Certainly, then, assignment of two attendants to supervise sixty-six patients in a ward for disturbed patients, consisting of four dormitories and twenty rooms, and including the restraint room, was insufficient supervision, and constituted negligence.

Confining a patient of Benturira's known strength, disposition and record in the same room with a patient toward whom he was known to bear ill will was an invitation to trouble, and in the absence of close observation and supervision certainly constituted further negligence. Half-hour inspections, even if punctually made, would seem few enough in such a ward, and certainly inadequate with respect to a restraint room, particularly when occupied by these particular patients. For an attendant, when not making rounds, to be stationed in such a position that he could neither see nor apparently hear disturbances in the restraint room compounds the fault. Finally, in view of the known fact that patients could escape, and had

escaped, from restraint sheets, it would have been only an elementary precaution to segregate defective sheets from those in good condition.

It also appears that no physician examined Scolavino until nine or more hours after the assault, and that no eye specialist saw him until six days had elapsed. We do not predicate negligence on this element specifically, since it probably made no actual difference in the outcome, but neither do we entirely overlook it in assessing the degree of care afforded the patients.

. We conclude that the State of New York, through its officers and employees at the Harlem Valley State Hospital, was negligent in failing to provide adequate supervision over these patients; that the assault against the claimant resulted from such negligence and through no fault of his, and that he is therefore entitled to claim damages.

The State has attempted to show that the claimant suffered no pain, and presumably, therefore, has suffered little or no actual damage. The claimant has attempted to show that but for the assault he might have returned to society as a free and useful member. We adopt neither extreme. It is incredible that the claimant suffered no pain or mental anguish from the assault and the resulting blindness, and the more convincing evidence is to the contrary, although there is some evidence that his periods of conscious pain were irregular rather than continuous as might be expected of a normal person. Nevertheless, he did suffer pain and is permanently blind. Previously, although mentally deficient, he had been able to read and to observe and apparently to enjoy life in some degree. As was stated in *Gallachicco* v. *State* (43 N. Y. S. 2d 439, 442): "Persons of a low mentality suffer no less than their intellectual superiors. It was very aptly stated by my learned colleagues in *Johnson* v. *State*, 176 Misc. 347, 27 N. Y. S. 2d 945, 948: 'His unfortunate mental condition did not alleviate his physical pain.'"

Mental suffering is a presumed consequence of physical injury in the case of an insane person as well as a sane person, unless it be proved that his condition is such that he does not experience pain. (*Gulf, W. T. & P. Ry. Co.* v. *Holzheuser*, 45 S. W. 188 [Tex., 1898]; *Tweed* v. *Western Union Telegraph Company*, 107 Tex. 247 [1914].) The record is devoid of any suggestion that the claimant's mental condition was such that he would not experience pain.

On the other hand, it is extremely dubious that claimant could ever have returned to society as a useful or even merely

a harmless member, irrespective of the assault. The evidence is clear that his mental age was less than half that of a normal person, and that he was of a disagreeable and assaultive nature. The hospital physicians were unanimous that his condition was incurable. Experiments in allowing him to return home had proved unfortunate. It may be safely concluded that he was in any event doomed to a lifetime spent in mental institutions. This being the case, his living at State expense is assured, and loss of potential earnings is not an element in assessing damages.

In view of these various circumstances, we conclude that claimant is entitled to damages in compensation for his pain, suffering and permanent blindness in the sum of $9,000.