George TAYLOR, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 12034.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 2, 1954.

Decided March 14, 1955.

Petition for Rehearing In Banc
Denied April 29, 1955.

Prettyman, Circuit Judge, dissented.

Mr. Edward de Grazia, Washington, D. C. (appointed by this Court), with whom Mr. Charles Jay Pilzer, Washington, D. C. (appointed by the District Court), was on the brief, for appellant.

Mr. Gerard J. O'Brien, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., and Lewis Carroll and Edward Troxell, Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, PRETTYMAN and WASHINGTON, Circuit Judges.

EDGERTON, Circuit Judge.

The appellant was indicted in December 1952 for robbery, housebreaking and grand larceny alleged to have been committed on October 25 and 27, 1952. Before trial, in proceedings under 18 U.S.C.A. § 4244, he was found in March 1953 to be "presently insane and so mentally incompetent as to be unable to understand the proceedings against him, or properly to assist in his own defense". He was committed to St. Elizabeths Hospital "until he is mentally competent to stand trial * * * "[1] In October 1953 the Superintendent of the Hospital certified that the appellant was mentally competent to stand trial, and in November 1953 he was tried.

His only defense was insanity. A psychiatrist, Dr. Joseph L. Gilbert, who examined him five times in January and February 1953, at the District Jail, on order of the court, testified in support of this defense. In Dr. Gilbert's opinion the appellant, at the time of the alleged offenses, was of unsound mind, suffering from dementia praecox, with symptoms that included confusion, memory failures, hostility, hallucinations and delusions. Dr. Gilbert also testified that appellant could not in a major way, or in any major activity, distinguish between right and wrong.

The prosecution called Dr. Leon Joseph Epstein, a staff psychiatrist and attending physician in the ward in which appellant was confined at St. Elizabeths from March to October 1953. Dr. Epstein promptly suggested that what he had learned from his patient was privileged. The court ruled it was not. Dr. Epstein then testified that appellant told him he had not suffered from hallucinations or delusions, but had been "going along with a gag" in describing such episodes. In Dr. Epstein's opinion the appellant, when he saw him, could distinguish between right and wrong. He

---

[1]. 18 U.S.C.A. § 4246 provides that when an accused is found mentally incompetent "the court may commit the accused to the custody of the Attorney General or his authorized representative, until the accused shall be mentally competent to stand trial * * *."

could not say whether appellant was able to do so at the time of the alleged offenses. He said appellant suffered from a "sociopathic personality disturbance with an anti-social reaction" and had a psychopathic personality, but was not psychotic or insane.

The appellant was convicted and sentenced to imprisonment for 5 to 15 years.

## I

■ When an accused person has been judicially found incompetent to stand trial, it is erroneous to try him until it has been judicially determined that he is competent to stand trial. Gunther v. United States, 94 U.S.App.D.C. ——, 215 F.2d 493 (decided after appellant Taylor was tried). There was no such judicial determination here.

■ If this were the only error a new trial might not be necessary. So far as this error is concerned justice might perhaps be served, in the circumstances of this case as in those of Gunther, by a remand to the District Court "to determine in a hearing whether appellant was competent to stand trial when he was tried and sentenced." 215 F.2d at page 497. But there are other errors.

## II

■ "In the courts of the District of Columbia no physician or surgeon shall be permitted, without the consent of the person afflicted, or of his legal representative, to disclose any information, confidential in its nature, which he shall have acquired in attending a patient in a professional capacity and which was necessary to enable him to act in that capacity * * *." D.C.Code 1951, § 14–308, 29 Stat. 138. " 'The local statute is very broad. It forbids disclosure by the physician of any information obtained by him in his professional capacity.' " Sher v. De Haven, 91 U.S.App. D.C. 257, 260, 199 F.2d 777, 780, 36 A.L.R.2d 937, certiorari denied, 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed. 1363.

In regard to mental patients, the policy behind such a statute is particularly clear and strong. Many physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him. "The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. * * * It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand." [2]

"Presumably all of the patients in any good mental hospital are receiving psychiatric treatment. That is true of persons whether they are sent to St. Elizabeths Hospital as civil insane, as criminal insane, or as 'sexual psychopaths.' " [3]

Dr. Epstein testified that his work at St. Elizabeths was "entirely in the field of the treatment of patients that are mentally ill." In reply to a question whether he functioned at the hospital as he would in private practice he said only: "There is an essential difference * * * by the very nature of the fact that most of the patients whom we see at St. Elizabeths are psychotic patients. In private practice the patients whom I see in my office are overwhelmingly psychoneurotic and they may be treated on an out-patient basis."

Dr. Epstein treated the appellant about seven months. He testified: "In

**2.** Guttmacher and Weihofen, Psychiatry and The Law (1952), p. 272.

**3.** Winfred Overholser, Superintendent of St. Elizabeths, "Some Problems of the 'Criminal Insane' at Saint Elizabeths Hospital", Med.Ann. of D.C., Vol. XXII, p. 349, July 1953.

checking my notes I found five recorded interviews with him. However, I make daily rounds in the part of the hospital where he was a patient and had occasion to see him many other times." Dr. Epstein was asked, "Did you as the attending physician of that ward look at the admittance record to see what diagnosis is placed on his chart as to his mental ailment?" He replied, "I did."

■ Obviously Dr. Epstein attended Taylor "in a professional capacity". Obviously he succeeded in getting his patient's confidence. He tried to respect it as the District of Columbia statute requires. The court erred in requiring him to violate it.

■■ The cases on which the government relies [4] do not support its position. They hold that a doctor who does not treat a prisoner, but only examines him in order to testify about his condition, may testify about it. Of course he may.[5]

Examination for testimonial purposes only has *nothing* to do with treatment. A doctor who makes such an examination is not "attending a patient". There is no confidential relation between them. Instead of implying that confidence will be respected, the circumstances imply the contrary.[6] It is a far cry from such cases to the government's contention that a psychiatrist who treats a patient charged with crime may expose the man's secrets to a jury despite a statute that expressly excludes information "acquired in attending a patient." The statute does not say or imply that the privilege it creates may be withheld from patients who have been committed to a public mental hospital. Most courts that have considered the matter hold, as we do, that such patients are entitled to the protection of such a statute.[7]

■ 18 U.S.C. § 4244, which provides for the examination of accused persons

4. Catoe v. United States, 76 U.S.App.D.C. 292, 131 F.2d 16; People v. Sliney, 137 N.Y. 570, 33 N.E. 150; Commonwealth v. Di Stasio, 294 Mass. 273, 1 N.E.2d 189; etc.

In Neely v. United States, 1945, 80 U.S. App.D.C. 187, 150 F.2d 977, the defendant (1) was already convicted, (2) was not under treatment, and (3) himself asked that the Commission on Mental Health inquire into his sanity and report to the court.

5. This assumes the absence of a special statute, such as 18 U.S.C. § 4244, which restricts the examining doctor's testimony; *and the absence of deceit,* cf. People v. Leyra, 302 N.Y. 353, 98 N. E.2d 553, Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948. "The general rule, in jurisdictions having a statute prohibiting a physician or surgeon from disclosing information acquired in attending a patient in a professional capacity, is that where the physician or surgeon is consulted for the purpose of examination only, and not for treatment, communications made to him, or information acquired by him, on such examination, are not privileged." 107 A.L.R. 1495.

6. In the Catoe case, supra note 4, the prisoner was expressly warned, as he should be, against making damaging statements. Moreover Catoe was and Taylor *is not within an express statutory excep*-

tion absolving physicians from the obligation of confidence in criminal cases that involve injuries to human beings.

7. Massachusetts Mut. Life Ins. Co. v. Board of Trustees of Michigan Asylum for the Insane, 1913, 178 Mich. 193, 144 N.W. 538, 51 L.R.A.,N.S., 22; Casson v. Schoenfeld, 1918, 166 Wis. 401, 166 N.W. 23, L.R.A.1918C, 162; Linscott v. Hughbanks, 1934, 140 Kan. 353, 37 P.2d 26; Westphal v. State, 191 Misc. 688, 79 N.Y.S.2d 634, 638; McGrath v. State, 200 Misc. 165, 104 N.Y.S.2d 882; Petition of Maryland Casualty Co., Sup., 78 N.Y.S.2d 651. As Judge Prettyman points out, some New York courts have held the contrary.

"The great weight of authority * * * is to the effect that the fact of the patient being an inmate of an asylum or hospital does not deprive the patient of the protection of [such a] statute. * * * 'It is not necessary, in order that matter communicated to a physician be held privileged, that the physician be employed by the patient. On the contrary the rule seems to be that so long as the physician acted in a professional capacity, and obtained information for the purpose of prescribing for the patient in that capacity, the matter is privileged, regardless of who employed him or how he came into the case.'" Linscott v. Hughbanks, supra, 37 P.2d at page 31.

to determine whether they are competent to stand trial, does not limit the privilege of accused persons. It extends the privilege, though we need not concern ourselves with the extension. It restricts the testimony that a psychiatrist who so much as *examines* an accused person, pursuant to this section, may give. It provides: "No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding." Since the whole of Dr. Epstein's testimony was inadmissible by reason of the District of Columbia privilege statute, we need not consider whether some or all of it would have been inadmissible by reason of 18 U.S.C. § 4244 if Dr. Epstein had merely examined Taylor and not treated him.

Taylor did not consent to the violation of his privilege. He made no effort to consent. No effort he might have made would have been effective. Since it had been judicially determined that he was incompetent to stand trial, he could not validly consent to a trial or any part of a trial.[8] In the course of a civil trial, perhaps an incompetent's committee might consent to the admission of privileged testimony.[9] But this was not a civil trial and Taylor had no committee. He could no more authorize a "legal representative" to consent to the admission of Dr. Epstein's testimony than he himself could consent. His failure to protest had no more effect than a positive expression of consent would have had.

What we have said relates only to the privilege of the accused when he is brought to trial. Exclusion of Dr. Epstein's testimony in Taylor's criminal trial does not mean that his testimony is to be excluded from consideration by the trial judge when he decides, in accordance with § 4244 and the rule of the Gunther case, the preliminary question whether Taylor is competent to stand trial. The judge may receive and consider, on that issue, any relevant testimony from Dr. Epstein. Section 4244 was passed after the District of Columbia privilege statute. It must be interpreted broadly enough to give effect to the apparent purpose of Congress that the question of competence to stand trial may be determined, at a judicial hearing distinct from the trial itself, in the light of all available information from the psychiatrists to whose care the accused has been committed.

## III

The judge said to the jury: " * * * we are not dealing with the question of his capacity to stand trial at this time because that has been established, by his having been released from St. Elizabeth's Hospital * * *." Since no judge had found the appellant competent to stand trial, the quoted statement did not literally violate the provision of 18 U.S.C. § 4244 that "A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury." But we do not interpret the statute so narrowly. Its fair meaning is that the jury shall not be told that the accused has been found competent to stand trial. The judge's statement therefore violated the statute. We cannot say it did not prejudice the defense of insanity.

## IV

Durham v. United States, 94 U.S.App.D.C. ——, 214 F.2d 862, had not been decided when Taylor was tried,

---

8. "The patient whose medical history is sought herein being incompetent * * * privilege cannot be waived * * *."

Westphal v. State, 191 Misc. 688, 79 N.Y.S.2d 634, 641.

9. McGrath v. State, 200 Misc. 165, 104 N.Y.S.2d 882, 888.

and the judge necessarily instructed the jury on the "right and wrong" and "irresistible impulse" tests then in use. But in the course of his instruction he said: "Dr. Epstein testified that in his opinion the defendant is not insane; that he has what is called a sociopathic disturbance which is not a mental disturbance and which is not within the definition of insanity as defined by law."

Dr. Epstein did not testify that "a sociopathic disturbance * * * is not within the definition of insanity as defined by law." He neither did nor could testify as to what is or is not within the legal definition of insanity. Accordingly the judge cannot have meant, and the jury can hardly have thought he meant, that Dr. Epstein gave such testimony. Since the judge did not mean that, he must have meant to tell the jury that "a sociopathic disturbance * * * is not within the definition of insanity as defined by law." The jury can hardly have failed to think they were so instructed.

But it is for the jury, not the judge, to decide whether a given psychiatric diagnosis, if accepted, brings the accused within the legal definition of insanity. Stewart v. United States, 94 U.S.App. D.C. ——, 214 F.2d 879, 882. The instruction was therefore erroneous.

### V

The appellant did not testify. He was not voluntarily in court. The judge said to the jury: "You have observed the defendant at this trial. You have a right to take that into consideration."

If such instructions were commonly given, defendants who plead insanity would be encouraged to make a show of insanity in court. Since we are revers-ing the conviction on other grounds we need not consider whether the instruction violated appellant's constitutional privilege against compulsory self-incrimination.[10]

### VI

■ The appellant says the judge told the jury, in effect, that if the appellant was acquitted he would go free. We think he did not convey that erroneous idea. But we think that when an accused person has pleaded insanity, counsel may and the judge should inform the jury that if he is acquitted by reason of insanity he will be presumed to be insane [11] and may be confined in a "hospital for the insane" [12] as long as "the public safety and * * * [his] welfare" require.[13] Though this fact has no theoretical bearing on the jury's verdict it may have a practical bearing.

### VII

■ "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Rule 52(b), Fed.Rules Crim.Proc. 18 U.S.C.A. We have repeatedly applied this rule to errors in admitting evidence and instructing juries.[14] It is especially appropriate when the mental competence of the accused is in question. His competence cannot be assumed and his rights disregarded because he has done the physical acts charged.

The judgment is reversed for the reasons discussed in parts I, II, III and IV of this opinion.

Reversed.

PRETTYMAN, Circuit Judge (dissenting).

I disagree with my brethren in this case.

10. Cf. Holt v. United States, 218 U.S. 245, 252–253, 31 S.Ct. 2, 54 L.Ed. 1021; McFarland v. United States, 80 U.S.App. D.C. 196, 150 F.2d 593; Wigmore on Evidence, 3d ed., §§ 2263, 2265.

11. Orencia v. Overholser, 1947, 82 U.S. App.D.C. 285, 163 F.2d 763.

12. D.C.Code 1951, § 24–301. Cf. 24 U.S. C.A. § 211.

13. Barry v. White, 1933, 62 App.D.C. 69, 71, 64 F.2d 707, 709. Cf. Durham v. United States, 94 U.S.App.D.C. ——, ——, 214 F.2d 862, 876, fn. 57.

14. E. g., Robertson v. United States, 84 U.S.App.D.C. 185, 171 F.2d 345; Simmons v. United States, 92 U.S.App.D.C. 122, 206 F.2d 427.

In the first place no objection to the testimony of Dr. Epstein was made at the time by defense counsel, no objection was made to the charge to the jury in which that testimony was discussed, and no point as to this testimony was made in the motion for a new trial. The Rules of Criminal Procedure provide that objections to evidence, and the grounds therefor, shall be made known to the trial judge[1] and that objections to instructions must be noted before the jury leaves the box.[2] Substantial justice does not require a departure from the applicable rules; this man, Taylor, was clearly proven guilty and, indeed, did not even claim that he did not commit the robbery. I would abide by the rules and not now entertain an attack upon the admission of the evidence or the instruction to the jury.

In the second place, under the statute[3] information otherwise inadmissible can be disclosed with the consent of the patient or of his legal representative. In the present case both the patient and his legal representative sat silent in the courtroom when it was proposed to disclose these communications and the other material. I would construe that willful silence as consent.

The court indicates that Taylor's consent cannot be accepted, because he is now alleged to have been incompetent at the time and so could not either consent or authorize his legal representative to do so. But Taylor had been reported competent, and in the eyes of the law at the time he was competent; otherwise he would not then have been undergoing trial. My view is that if he was competent to stand trial he was competent to consent to this evidence. This ruling, that the privilege extends to an allegedly incompetent person but that neither he nor his legal representative can give consent for the use of the medical testimony, is a disturbing phase of this opinion. In the next place the statute does not re- quire authorization from the patient to validate a consent given by a legal representative. It pointedly omits reference to any such authorization. Indeed, by validating a consent given by a "legal representative", it seems to contemplate the possible absence on the part of the patient of capacity or willingness to consent. A guardian, custodian or committee, as well as a duly authorized attorney, may give consent under the statute.

In the third place I think this testimony was not privileged. When pursuant to the dictates of criminal justice a person is confined by order of a court in a state institution for the mentally ill, the relationship between him and the doctor on the staff at that institution is not the ordinary relationship between physician and patient contemplated and treated by the statute which confers the doctor-patient privilege.[4] Under such circumstances the Government, as a matter of public concern, is entitled to the benefit of the testimony of those doctors, whether as to diagnosis, treatment or observation. It is contrary to the interests of justice to give such an accused person power to close the mouths of those doctors.

The practicalities of this decision by the court must be grasped. The facts in the case at bar are sufficient illustration. This man, Taylor, was examined for mental competency pursuant to Title 18, Section 4244, United States Code. One of the examining psychiatrists reported him incompetent; the other doctor did not report. An inquisition was thereupon had, and the man was found incompetent and committed to the hospital pursuant to the statute. All the while he was under indictment for robbery, housebreaking, and grand larceny. After Taylor had been in St. Elizabeths six months the Superintendent reported him competent. This court now holds that Taylor has the power, by refusing con-

---

1. Rule 51.

2. Rule 30.

3. 29 Stat. 138 (1896), as amended, D.C. Code § 14–308 (1951).

4. Ibid.

sent to the doctor's testimony, to close the mouth of any Government doctor who observed or treated him while he was at St. Elizabeths and who says he was and is sane and competent; but he can clear for admission into evidence the testimony of any doctor who says he is insane or incompetent. Dr. Gilbert can testify, but Dr. Epstein cannot. And this in spite of the fact that Dr. Gilbert made only spot examinations (on five separate days) whereas Dr. Epstein observed and treated the man regularly for six months. To me this result is simply not realistic or in the public interest.

It must be understood that the court is not merely excluding admissions against interest made by an accused. It is applying the physician-patient privilege statute, and that statute applies the privilege to "any information, confidential in its nature, which he [the doctor] shall have acquired in attending a patient in a professional capacity and which was necessary to enable him to act in that capacity". This privilege covers all diagnosis and all treatment. So that this decision cuts off use of the testimony of all the Government doctors in these cases where an indicted man is in a Government hospital undergoing compulsory treatment as a result of which it is anticipated he will return to the authorities for trial. That is, it cuts off that testimony unless the accused consents, which in practical effect means unless it is favorable to him. It seems to me that this decision will badly handicap and confuse the handling of those cases in which persons accused of crime are committed to Government institutions because of incapacity to stand trial.

This court used the expression "ordinary patient-doctor relationship" in the Catoe case [5] in describing this statutory privilege. The full sentence was: "It protects the personal nature of an ordinary patient-doctor relationship." The cases clearly establish that, when an accused person is subjected to an examination by Government doctors, no doctor-patient relationship is established.[6] Taylor's commitment to St. Elizabeths was not for examination but was for treatment, and so those cases do not apply literally. But it seems to me the rationale applies. Certainly it is clear enough that the relationship between Taylor and Dr. Epstein was not the ordinary one of doctor and patient. Nothing was voluntary about it on either's part. And certainly nothing was confidential about Taylor's admissions; they were made before a conference of several physicians. He was a person in custody under authority of the criminal law. Dr. Epstein was acting in the capacity of a Government officer, not as a personal physician. It seems to me the rationale of the rule relating to examinations by Government officers, rather than that of the rule relating to physician-patient relationships, applies to the present problem.

I agree with the view held by some New York courts,[7] illustrated by the opinions in Liske v. Liske,[8] Munzer v. Blaisdell,[9] and Scolavino v. State.[10] In

5. Catoe v. United States, 76 U.S.App.D.C. 292, 295, 131 F.2d 16, 19 (1942).

6. State v. Fouquette, 67 Nev. 505, 221 P.2d 404 (1950), certiorari denied, 341 U.S. 932, 71 S.Ct. 799, 95 L.Ed. 1361 (1951); Commonwealth v. Gordon, 307 Mass. 155, 29 N.E.2d 719 (1940); Commonwealth v. Di Stasio, 294 Mass. 273, 1 N.E.2d 189 (1936); Commonwealth v. Sykes, 353 Pa. 392, 45 A.2d 43 (1946); People v. Dutton, 62 Cal.App.2d 862, 145 P.2d 676 (1944); Simecek v. State, 243 Wis. 439, 10 N.W.2d 161 (1943).

7. Other New York courts hold the contrary.

8. Sup., 135 N.Y.S. 176 (1912).

9. 183 Misc. 773, 49 N.Y.S.2d 915 (1944), affirmed, 269 App.Div. 970, 58 N.Y.S.2d 359 (1945).

10. 187 Misc. 253, 62 N.Y.S.2d 17 (1946), modified, 271 App.Div. 618, 67 N.Y.S.2d 202 (1946), affirmed as modified, 297 N.Y. 460, 74 N.E.2d 174 (1947).

the latter case the court quoted with approval from the Liske case, as follows:

" ' * * * I do not think that the relation arising by operation of law between a patient committed by legal process to a state institution for the insane and the official physicians in charge thereof is within the professional relation contemplated by Section 834 of the Code of Civil Procedure, or that such section was designed to exclude the testimony of such official physicians, whose duty it is under the police power of the state to make physical examinations of irresponsible patients. * * * ' " [11]

The New York court, in the Scolavino case, also cited and relied upon Professor Wigmore's analysis of the physician-patient privilege.[12]

Finally, on this point, I doubt that Taylor's admission to Doctor Epstein and his confreres, that the descriptions given other psychiatrists of delusions and hallucinations were just a gag, is covered by the privilege. The statute does not cover every communication; its protection is limited to confidential information which is necessary to the doctor to enable him to perform his professional duties. The statute actually was directed, of course, to revelations by patients, and others, of symptoms and defects which the doctor must know about but which would not be revealed to him except in confidence. That concept must be carried over into the field of mental illness, and so the mere fact of statements by the patient may be part of the diagnostic material. But it seems to me to stretch the principle of the rule beyond its elastic limits to hold that a candid, repeated statement that claims of delusions, etc., were false, is part of the data necessary to permit Dr. Epstein to perform his duties as an attending physician. Certainly an admission of guilt to a crime would not be privileged by this statute. Reasonably, then, an admission of the falsity of a defense ought not to be privileged.

I emphasize, as I have already noted, that Taylor's admissions were not made to Dr. Epstein alone in the course of some sort of confidential inquiry. They were made and repeated to a group of doctors who heard him in a body. This is not the ordinary doctor-patient communication.

I do not agree with other parts of the opinion of the court, but those points are minor in comparison with the matter I have discussed. I will not extend this opinion to elaborate upon them.

I agree with the court that Taylor should have a hearing pursuant to Gunther.[13] But I would not reverse the judgment for that purpose; I would follow the procedure as well as the principle of Gunther.

11. Id., 62 N.Y.S.2d at 20–21.

12. 5 Wigmore, Evidence § 2285 (3d ed. 1940).

13. Gunther v. United States, 94 U.S.App. D.C. ——, 215 F.2d 493 (D.C.Cir.1954).