## Commonwealth v. Sheeler

*James Tracey*, assistant district attorney, for Commonwealth.

*Louis B. Schwartz*, for defendant.

BROWN, JR., P. J., October 2, 1950.—Defendant, Rudolph Sheeler, pleaded guilty to an indictment for murder on March 24, 1939, before the late President Judge Harry S. McDevitt, who called in two other judges, Francis Shunk Brown, Jr., and James C. Crumlish, to hear the plea with him, in accordance with Rule 43 of the Court of Oyer and Terminer of Philadelphia County. On March 29, 1939, before the three judges, upon arraignment defendant again pleaded guilty, and evidence was presented both by the Commonwealth and defendant. After consideration, on March 31, 1939, the court unanimously adjudged him guilty of murder of the first degree with the penalty fixed at imprisonment for life, and sentence was imposed accordingly.

Nine years later, on May 21, 1948, defendant presented to the Supreme Court of Pennsylvania a petition for the court to grant a rule for a new trial nunc pro tunc notwithstanding the expiration of the term in which he was convicted and sentenced, pursuant to the Act of April 22, 1903, P. L. 245, 19 P. S. Secs. 861-863. The rule to show cause allowed by the Supreme Court was discharged, and on defendant's petition for reconsideration, the Court, on October 5, 1948, authorized the Court of Oyer and Terminer of Philadel-

phia County to grant a rule for a new trial nunc pro tunc. On February 25, 1949, defendant's motion and reasons for a new trial were filed in this court, and on April 25, 1949, the motion was heard by the court, consisting of the same three judges who had heard defendant's plea of guilty and sentenced him. Before a decision was reached President Judge McDevitt died. The assistant district attorney, who appeared for the Commonwealth against the motion, has also died. Counsel for defendant, who presented his petition and motion to the court, has withdrawn from the case, and new counsel has entered an appearance for him. The latter submitted a petition for reargument to the two remaining members of the court, but withdrew it before the court had entered any order thereon.

The Act of 1903, from which this proceeding derives validity, provides, in section 1, that, "whenever by petition, supported by after discovered evidence, it shall be made to appear to the supreme court that there is ground for substantial doubt as to the guilt of any prisoner convicted of murder of the first degree, the said court shall have power to authorize the court of oyer and terminer in which such prisoner has been convicted to grant a rule for new trial, nunc pro tunc, notwithstanding the expiration of term in which such prisoner was convicted and sentenced; and thereupon the said court of oyer and terminer may, in its discretion, grant and proceed to hear such rule, as in other cases"; in section 2, "Upon the termination of the hearing of such rule, if the court of oyer and terminer shall not deem the grounds sufficient it shall thereupon discharge said rule, and the proceedings shall terminate, and the judgment and sentence theretofore entered of record shall remain unaffected"; and, in section 3, "But if said court of oyer and terminer shall be of opinion that, of right and justice, a new trial should be granted, it shall set forth its opinion to that

effect, and thereupon the prisoner may bring the opinion, together with the evidence, before the supreme court, as if upon appeal; and if the supreme court shall, after hearing, concur with the court of oyer and terminer that of right and justice a new trial should be had, it shall have power to authorize the court of oyer and terminer to make the rule for new trial absolute; and thereupon the case shall proceed in said court as if a new trial had been granted in due course, at the instance of the prisoner during the term." It is thus apparent that if this court be of the opinion that a new trial should be granted, it can *not* make the rule therefor absolute unless and until the Supreme Court concurs and authorizes it to do so, but if this court discharge the rule, the proceeding is then terminated, for there is no appeal from such an order to the Supreme Court: *Com. v. Greason*, 208 Pa. 126, 126-127; *Com. v. Cicere*, 286 Pa. 296, 297; *Com. v. Del Vaccio*, 303 Pa. 519, 521-523. Mindful of the responsibility of finally terminating this proceeding placed on this court by law, the two surviving judges who heard the motion for a new trial have carefully considered defendant's allegations in support thereof before reaching the conclusion required of right and justice. We have reviewed his averments, and the supporting affidavits, in connection with the evidence presented at the trial following his plea of guilty, and weighed them for reasonableness, probability of truth, and effectiveness of attack on the judgment entered after full hearing: *Taylor v. Alabama*, 335 U. S. 252, 264, 265. Although cognizant that the basis of any proceeding under the Act of 1903 is after-discovered evidence, the consideration given to defendant's application has not been so limited, but it has been viewed in broader aspect.

The evidence presented to the court upon defendant's pleading guilty disclosed that in the fall of 1936 a number of robberies were committed during the late

afternoon or early evening in the northeastern part of Philadelphia in the general vicinity of the store of Sears, Roebuck and Co., located on the Roosevelt Boulevard at Adams Avenue. Pocketbooks were snatched from women, and in the commission of the crimes violence was used. On September 19, 1936, a woman was shot and injured in the arm after being knocked down to and while lying on the ground. Police officers were specially assigned to duty in the neighborhood, and on November 23, 1936, patrolman James T. Morrow was shot and killed. The bullets extracted from the woman's arm and Morrow's body came from the same gun. After the killing of patrolman Morrow, the snatching of pocketbooks in the vicinity stopped.

On February 6, 1939, one Jack Stich, alias Jack Batton, alias Jack Howard, was shot and killed by a detective while resisting arrest. Following his death, the police ascertained that his relations with the sister of defendant, Rudolph Sheeler, were intimate, and when the latter visited her in St. Mary's Hospital later in the month, he was arrested.

Defendant made the statement containing his confession of participating in the killing of patrolman Morrow to the police on February 23, 1939. He stated, inter alia, that in the middle part of November, 1936, immediately on arriving in Philadelphia, on a bus from New York, he got in touch with Jack Batton, and asked him for money; that Batton had only some change; that they waited until dark; that Batton grabbed a pocketbook from a woman while he acted as lookout; that he heard a shot and saw a woman lying on the ground; that they escaped; that the proceeds of this bag were $10 in cash; that Batton had another bag, and this yielded $5; that they both needed money at the time, and they were not satisfied with what they had made; that they decided to get the late shoppers at Sears Roebuck, and went to the parking lot there;

that while waiting for such an opportunity, Batton drew his attention to a man watching them; that as the man, whom they concluded to be a policeman, approached them, and when Batton said they had better scram, the man flashed a light directly in front of them from his flashlight; that the man was about six or eight feet away; that Batton had two guns in his hands; that he heard four or five shots in rapid succession; that they ran; that when they stopped, Batton gave him the gun, and he put it in his belt; that he decided to go back to New York to establish an alibi in case the crime was traced to them; that he got a truck that took him to Trenton, and another one to Rahway, sitting on the tailboard, so the driver would not see him; that a man in a coupe took him to New York; that he hid the gun, and that a couple of days later Batton came to New York and he turned the gun over to him. This statement, in the form of questions and answers, appears in full in the notes of testimony, and is incorporated herein by reference thereto. It is to be noted, however, that the photostatic copy thereof, which is attached to the answer of the district attorney to defendant's petition for allowance of a new trial filed in the Supreme Court, and which is also incorporated herein by reference thereto, shows that not only did defendant sign each page, but he also, in his own handwriting, made corrections in the statement, which he wrote out on a separate sheet.

The detectives, who had custody of defendant following his arrest and who questioned him, testified that they did not abuse him, beat or hit him—that no force was used on him—that the descriptions in the statement were his own and that he was not asked leading questions—that he wanted to make a clean breast of everything—that everything he did was done voluntarily. The detectives told about his taking them to the scene and reënacting the shooting of the woman and of

patrolman Morrow. It also appeared from their testimony that Jack Stich, alias Batton, alias Howard, was a vicious and ruthless criminal, carrying two and sometimes four guns, and shooting upon the slightest provocation, and that from the information defendant gave them, a large number of robberies, homicides, and other crimes of violence in Philadelphia and New York over a period of several years committed by him and Batton were cleared up.

Defendant voluntarily took the stand. He described his relations with Jack Batton, and the manner in which they committed robberies together. He told about robberies he committed by himself, and how he snatched pocketbooks. He referred to the robbery of the woman whom Batton knocked down and shot in the arm two months before the killing of patrolman Morrow, pointing out that as there were three women, he did not care to use their usual procedure of his grabbing the pocketbook and Batton standing back with the guns. He then narrated what occurred when patrolman Morrow was shot to death. His testimony supplied details not included in his statement to the police, such as hiding in the weeds to be less conspicuous than standing on the road; Morrow's grabbing his stomach, trying to say something, and falling, and Batton's giving the gun to him to transport it to New York so that he (Batton) would not have to take the chance of transporting it, the latter having had the habit of keeping a gun in New York and a gun in Philadelphia or two guns in each place, depending on how many he had, to save the transportation of guns on his person. He gave the reason for Batton's always carrying two guns—a man, whom he (Batton) had held up, took his gun away from him while they were wrestling, and he never wanted to be in the position of only having one gun, in case the next man might take it from him. He volunteered to relate something he had told the police about Batton's

going to Saratoga where a man was killed, but when he said it did not concern this case, the court did not permit him to do so.

Defendant testified that he had been in the custody of the police since February 16, 1939; that they had treated him very well; that he had remarked to his counsel, while the detectives were testifying, that one was "a very fine man, a good guy", and two were "the finest men I ever met". He then addressed the court: "Your Honor, if you please, they treated me very nice." He also volunteered: "Your Honor, the police didn't care whether I was guilty or innocent, they treated me fine. They didn't touch me or anything." And further: "I would like to say for the benefit of anyone listening that they are just the finest people I have ever known." He said that the two detectives who were with him at all times, treated him "wonderful", and that another one treated him "fine". Later he corrected an answer to a question put to him by one of the judges, in that he did not get the money to go back to New York after Morrow's being killed from Batton but "hiked a ride back", as appeared in his statement to the police.

Defendant was not cross-examined by the assistant district attorney prosecuting the case, but his testimony was given in response to questions by his counsel and the three members of the court. His counsel were two able and experienced members of the Philadelphia Bar appointed by the court to represent him.

Defendant made another statement to the police dated March 31, 1939. In this he gave his life's history, telling about his family—his being in St. John's Orphanage—his sister's and his relations with Jack Howard (Jack Batton)—Howard's taking him out to steal—Howard's giving him guns—their holding up milkmen—the signals between them—his entering houses—Howard's shooting in holdups—his snatching pocketbooks by himself—Howard's having guns

hidden in New York and Philadelphia, and their making trips back and forth—his having a gun and shooting it when alone in holdups—his helping Walter Ferguson with money obtained from pocketbooks he snatched—his escape from a police officer who took a gun from him—Ferguson's keeping a gun for Howard —his being arrested for siphoning gasoline from a car—Ferguson's joining him in two pocketbook snatchings, and their being arrested and found not guilty for stealing a car—his "playing fairies" and panhandling with Ferguson and Frank Hazzlet in New York—his grabbing women's pocketbooks with Howard nearby with guns to insure their escape—Howard's shooting a motorcycle officer in escaping from arrest after snatching a woman's purse. He told about the shooting of the woman in the arm hereinbefore mentioned; his re-enactment of the crime and his apology to the woman. He again described the killing of the patrolman Morrow and his escape to New York, although in much more detail than in his statement offered in evidence at the trial. He stated that he had participated with Howard in about fifteen holdups and about ten pocketbook snatchings in Philadelphia and in about ten in New York, and while alone he had committed about thirty or thirty-five pocketbook snatchings in Philadelphia. According to the district attorney's answer, and to the testimony presented at the trial, defendant had informed the police of a number of these crimes before the trial, and the facts given by him were verified by investigations. The statement dated March 31, 1939, consists of fifty-five typewritten pages, each of which was signed by defendant. Although in the form of questions and answers, a number of defendant's answers cover several pages, and he recounted many details which obviously could not have been suggested to him by the detectives. This statement is with the bill of indictment charging defendant with the murder of

James T. Morrow on November 23, 1936, and is incorporated herein by reference thereto.

In his petition for allowance of a new trial, defendant alleged, inter alia, that his confession on which the plea of guilty was based was not voluntary, but was induced by promises, threats, personal violence, mental torture and duress inflicted by the police officers—that from day to day he was cursed, threatened and struck; that he was questioned at times for many hours; that he was tortured mentally; that he was knocked down and kicked in the back and face; that finally he was told that if he would say that Jack Howard (Jack Batton) had shot Morrow in his presence, the police would make every effort to help him, let him off with a light sentence and use their influence later in obtaining a pardon, but if he refused, he would be accused of and prosecuted for various crimes and sent to prison for life, if not to the electric chair; that he finally agreed to give them whatever story they wanted, and that with their help and suggestions the story which they then typed and was then signed by him was repeated in substance by him on the witness stand. In the answer of the district attorney, after pointing out that there was no brutality, threats or intimidation even hinted at the trial, it was averred that the two detectives, who had defendant in custody from the time of his arrest to his trial, stated that they were with him when he reënacted the shooting of the woman in the arm and the killing of patrolman Morrow—that they never used any force on him whatsoever—that when he made his confession, the additional page in his longhand writing was done at his request as he did not approve of the answer as originally typed; and also that on March 29, 1939, at his request two detectives took him to St. John's Catholic Church in order to make a confession; that he made a confession in their presence but not within their hearing, and that after the confession, the priest asked

them, in defendant's presence, what was going to happen to him because of his crimes, which, of course, they could not answer.

In defendant's statement of February 23, 1939, containing his confession of guilt in the killing of patrolman Morrow, he stated that the man, who took him from Rahway to New York, noticed that he was very nervous, and he told him he had to get out of Philadelphia a cop having been hurt; that he saw this man again at police headquarters in Philadelphia on February 23, 1939, after returning from the line-up with two others; that while being questioned by the detectives this man was brought in and mingled with them; that he was asked whether he had ever seen this man before, and he replied that his face was familiar; that the man told him that he had seen him during November, 1936, and distinctly remembered giving him a lift on his trip to New York; that he then recalled that that was where he had seen the man; that the man described his clothing at the time—a brown leather jacket with a hole in the left elbow and a dirty cap; that the man informed him that as he stepped from the car, he noticed the handle of the revolver protruding from his pocket; and that he did not deny the facts as he knew them to be true. At the trial, one of the detectives testified that this man informed the New York police, who informed their department, and police officers went over to see him but they made no headway; that this man was located in Syracuse, brought here, and identified defendant; that defendant admitted telling this man about the shooting and his part in it. In defendant's statement to the police dated March 31, 1939, he described the clothing he and Jack Howard wore the night patrolman Morrow was killed; his ride with this man from Rahway to New York, and their subsequent recognition and identification of each other. In the an-

swer of the district attorney, it was stated that information had been received that this man, Hugh F. Quinn, died about three years ago, but a copy of his statement to the police on February 23, 1939, the same day as defendant's statement, is attached thereto, and is incorporated herein by reference thereto. This statement discloses, inter alia, that Quinn noticed the handle of the gun sticking out of the pocket of the man whom he had driven from Rahway to New York in November, 1936; that he immediately told a friend of the family, Inspector Michael F. McDermott of the New York police, about the occurrence, describing the man and his clothing; that he was later interviewed by the Philadelphia police; that he heard nothing from this information until February 22, 1939, when he identified the man amongst three men in the "stand-up" in Philadelphia; that he had no grievance against him, not even knowing his name; and that when defendant was again brought into his presence, he was positive defendant was the man. At the argument, the character of this man was attacked, but sexual aberration, even if true, would not of itself justify the ignoring of his statements, for they must be viewed in the light of all the attendant circumstances, such as his immediate report to the New York police of his taking a man in his automobile from Rahway to New York the evening when patrolman Morrow was killed, and his subsequent identification of defendant as this man. Also, even if Quinn were the same man whose criminal record was set forth in defendant's brief, the weight to be given to what he said and did is, for the same reasons, not lessened. It is apparent that defendant's confession resulted from his being confronted with Quinn, the latter's positive identification of him and the clothing he wore on the day patrolman Morrow was killed, and their mutual recognition of one another, and not from his being abused or threatened by the police.

In defendant's petition for allowance of a new trial, it was averred, inter alia, that evidence, alleged to have been discovered since his conviction, had been obtained to show that the confession and the testimony which he gave were not true but were induced and forced from him by personal violence, mental torture, threats and promises to help him secure release from whatever sentence might be imposed, this evidence being contained in affidavits attached to the petition. Two of these affidavits were by Walter Ferguson and Francis Hazlett. In his affidavit dated March 15, 1948, Ferguson stated, inter alia, that several days after defendant's arrest, he saw him in the Detective Bureau on the first floor of City Hall, Philadelphia, when he was there for questioning and defendant came out of one of the rooms; that defendant's hair was standing up, his suit was dirty and pulled apart, his face was marked with fresh bruises and swollen; that several days later defendant told him to tell the detectives everything they had done together, he (defendant) had already done so, and not to be afraid, nothing was going to happen to him; that he did so, and when he cited one of their pocketbook takings of 1933 or 1934, defendant remarked that he "forgot about that time," he "forgot to mention it; but it's okay, tell them everything"; that on February 25, 1939, when their respective wives visited them, and they were all placed together in a small room next to the cell room on the sixth floor of City Hall, defendant's face still showed marked swelling and bruises. Hazlett stated in his affidavit, dated March 12, 1947, inter alia, that he met defendant on February 16, 1939, when the latter came to Philadelphia to visit his sister at St. Mary's Hospital; that defendant told him not to go with him to the hospital "since he knew for certain that he was going to be arrested", to which he replied that he would go along since he had done nothing wrong; that both of them

were arrested and taken to the Detective Bureau on the first floor of City Hall; that defendant said something to the detectives to the effect of "All right, you guys are going to beat me up; get it over with"; that defendant was taken into another room, and even though the door was closed, he "could hear the noises of some body being beaten around"; that about fifteen minutes later, the door opened, and defendant came staggering out, his body being bent over forward, his arms hanging down and outward, his hair being torn, and blood pouring down his face, onto his clothes and down to the floor from both his nose and the right side of his head above his eye, and that a little more than a week following their arrest, defendant told the detectives in his presence that if they would let the others go free, he "would tell them the real story they wanted to hear". There is no doubt that defendant and Ferguson and Hazlett were in St. John's Orphan Asylum together, and that after their respective releases therefrom, they met, became close friends, and associated together for a number of years. This association led to the commission of crimes, in which defendant and Ferguson apparently participated together more than Hazlett, and in weighing the averments of the two affidavits, and determining the degree of weight to be given them by the court, such factors require consideration. A man will do all he can to help a close friend, especially when that friend has secured his release from the custody of the police, as defendant did for these two affiants. Their credibility is seriously affected by their involvment in crime with defendant over a number of years. Also, the charge of sexual aberration can be leveled against them, as it was against Quinn, and with more effect, because pecuniary gain was the motive. Another affidavit attached to defendant's petition for the allowance of a new trial was taken on April 23, 1948, by Maurice G. Weinberg, a member of the Philadelphia Bar, who

stated therein, inter alia, that several days prior to February 24, 1939, he was engaged by defendant's wife to locate, represent and defend him; that she believed he was under arrest at the time in Philadelphia; that he experienced considerable difficulty in locating him; that he was not granted an interview with defendant until he filed a writ of habeas corpus; that defendant "was at the time being held 'on ice', i. e. secretively held in custody, by the Detective Bureau of the Philadelphia Police Department", and that when he went to the Detective Bureau in City Hall with inquiries as to whether defendant was under arrest and if so at what police district he was being held, he was told they knew nothing at all about him, "though in truth he was under arrest and in their custody already four days." Defendant was not represented at trial by this affiant, but by two able and experienced members of the Bar assigned to defend him by the court upon his petition that he was wholly destitute of means and unable to employ counsel or prepare for his defense. Although this affiant apparently saw defendant on or about February 24, 1939, he made no mention of defendant's physical appearance, such as was described by Ferguson when the latter saw him on February 25, 1939, in the presence of his wife. "The mere fact that a confession is made in a police barracks [or in a detective bureau of a police department located in the county court house or elsewhere] after questioning does not make the statement involuntary . . .": *Com. v. Becker*, 326 Pa. 105, 118. "Where, by the Commonwealth's witnesses, it is shown [at the trial of an indictment for murder before a jury] that a confession is made voluntarily, without such threat or inducement as might secure a false confession, it must be admitted. If afterwards the defendant testifies, or produces other witnesses who testify, that it was not voluntarily made, it becomes a question for the jury . . .": *Com. v. Lockard*, 325 Pa. 56, 62.

But, at the trial of the present case, defendant did not challenge the method of securing his confession; to the contrary, he pleaded guilty, and then took the stand himself, and testified about the commission of the crime, supplying details not contained in his confession, and also volunteered statements showing clearly that he had not been ill treated by the police, and that his confession was made entirely of his own free will.

Defendant also averred in his petition, inter alia, that by the treatment he received at the hands of the police, he "either did not know or did not realize that on the night Morrow was killed in Philadelphia at 6:45 p.m. or thereabouts," he "was working for the White Castle System restaurants in New York City, having gone to work that night at either 7:00 or 8:00 o'clock." In support of this averment, and as part of the evidence alleged to have been discovered since defendant's conviction, there are attached to his petition an affidavit of L. W. Shackelford, District Manager of the White Castle System, Inc., dated March 17, 1948, certifying as to the truth of the statement made in a letter addressed to defendant's wife, signed by him, and dated May 25, 1939, that defendant "worked either from 7:00 P.M. to 5 A.M. or from 8:00 P.M. to 6:00 A.M. on Monday, November 23rd, 1936, and either from 7 P.M. to 5 A.M. or from 8:00 P.M. to 6 A.M. on Tuesday, November 24th, 1936", and also a photostatic copy of the time records of the corporation, recorded daily, for the week ending November 29, 1936, verified by the affidavit of this affiant, showing that defendant worked ten hours on Monday, Tuesday, Thursday, Friday, Saturday and Sunday of this week but not at all on Wednesday. In the latter, there is nothing to show the hours during the day or night when defendant was actually at work. While in the former they were stated, this information was based solely on affiant's recollection, for it is set forth in the district attorney's

answer to defendant's petition that the daily sheets of this corporation signed by the employees are destroyed at the end of one year, and so there it no way of telling therefrom which shift defendant worked. In defendant's statement dated March 31, 1939, he said, inter alia, that he worked the night shift from 9 P.M., November 22, to 7 A.M., November 23, 1936; that that morning he came to Philadelphia by bus, arriving at 12 noon, and after the shooting of patrolman Morrow, he arrived home in Long Island City, New York, about 2:30, went to bed, got up at about 5:30, and went to work at 7 in the morning (of November 24, 1936) as he was "supposed to do". He also stated that there were three shifts—a morning shift from 7 A.M. to 5 P.M., a middle shift from 11 A.M. to 9 P.M., and a night shift from 9 P.M. to 7 A.M. On the one hand there are the positive statements of defendant as to the hours when he worked, while on the other there are the uncertain statements of Shackleford thereabout. It thus appears that the information contained in these two affidavits does not outweigh the proofs before the court that defendant was at the scene when patrolman Morrow was killed.

The affidavits of the Rev. Bernard C. Farley, dated March 30, 1948, of Lawrence C. Lockley, dated March 26, 1948, and of George Dobbin Brown, dated April 5, 1948, all relate to statements made by defendant after he pleaded guilty and was in prison serving the sentence imposed by the court, and well described as self-serving declarations. Father Farley, who was the Catholic Chaplain at the prison at the time of defendant's commitment, stated that within two months after defendant was received at the penitentiary, defendant told him he was innocent of the crime for which he received the life sentence, and had firmly continued to assert his innocence. How much weight Father Farley gave to such assertions he does not state, but if he had

believed them or been impressed by them, it is strange that he did not mention or report them to the judges who heard defendant's plea of guilty and imposed the sentence, all of whom he knew personally and who had confidence in him and his judgment of the character of prisoners. Any suggestion or request from him to any of the three judges would have received the utmost consideration.

In the affidavit of Lawrence C. Lockley, reference is made to an article in a magazine about the case written by President Judge McDevitt which defendant discussed with him in January or February, 1940, and then told him he had no part in the murder and that his employer's records showed he was at work at a time when he could not have been present at the scene. This affiant stated that when he asked defendant if he wanted him to try to reopen the case, defendant replied in the negative, stating, inter alia: "They told me if I pled guilty, they'd let me out in a few years. If you get it re-opened, they might try to give me the hot seat". Of course, if a new trial be granted, defendant might be found guilty of murder in the first degree and the death penalty imposed by the jury (*Com. v. Alessio*, 313 Pa. 537, 546-547), but since he made this statement to Lockley, at least one important witness for the Commonweath has died, and no doubt this explains his change of attitude and present desire for a new trial. Moreover, his failure to mention his present contentions through the intervening years to President Judge McDevitt, who visited the prison not infrequently, and who was deeply concerned with the welfare of the prisoners and their families, evidencing a most friendly and helpful interest in them, shows that they are afterthoughts not based on facts.

After referring to conversations with another prisoner since paroled about defendant, George Dobbin Brown stated in his affidavit, inter alia, that defendant

"delayed so long in seeking to right his wrongs by re-course to legal action, partly because of his fear that the endeavor might bring him into still greater trouble, and partly because hopes of release had been held out to him from another quarter"; that in 1943 defendant told him Father Farley would be able before too many years to gain his release by means of a commutation of sentence by the State Board of Pardons and the Gover-nor, defendant not feeling the need of any other help at that time and insisting that it was best for him to depend entirely "on the friendly help of this priest", and that defendant "continued to pin all his hope on Father Farley for year after year, until he finally be-came so disillusioned by the help from this quarter that early in 1947 he decided to put his case" in the hands of counsel. Defendant did not have to rely on Father Farley or anyone else to present his case to the Board of Pardons; he could have himself filed a petition for commutation of sentence or a pardon, and it would have received fair and impartial consideration. Although it appears that "the Board of Pardons is the proper tribunal for him to appeal to" (*Com. v. Mathews*, 356 Pa. 100, 102), no application to it has ever been made either by him or in his behalf, but he chose to make the present application to the court for a new trial, aver-ring in his petition, inter alia, that the delay in making is was "due to the advice of his friends . . . that he would lose all hope of obtaining a pardon at any time if he should take any action which would involve any allegation of improper conduct on the part of the po-lice". There was, of course, no valid basis for such ad-vice; and this excuse for his delay in resorting to ju-dicial process appears to have been advanced as mere makeweight.

In defendant's petition for the allowance of a new trial, it was also averred, inter alia, that one George H. Bilger had admitted, by his own voluntary confes-

sion made immediately upon arrest, that he had killed patrolman Morrow; that on June 24, 1937, he was convicted of first degree murder with penalty fixed at death; that on June 20, 1938, he was granted a new trial, and pleaded guilty; that on July 1, 1938, he was sentenced to life imprisonment; that on November 3, 1938, he also pleaded guilty to the murder of one John Canham, and was sentenced to life imprisonment; and that on December 10, 1940, the Governor, pursuant to the recommendation of the Board of Pardons, which was based to a large extent on the letter from President Judge McDevitt stating that Howard (Batton) and defendant were responsible for the murders of Morrow and Canham, granted him a full pardon for both murders. At the time of defendant's trial before the three judges on March 29, 1939, it appeared that Bilger was tried by a jury before President Judge McDevitt, and found guilty of murder in the first degree with the penalty fixed at death by the jury; that Judge McDevitt did not feel and know that he was guilty; that a motion for a new trial, filed at the suggestion of the court and the district attorney, was granted; that subsequently he pleaded guilty, and was sentenced to life imprisonment; that on the same day he also pleaded guilty to the murder of one Louis Canham, and sentenced to life imprisonment; and that Canham was killed by Jack Howard. Exhibits attached to defendant's petition disclosed, inter alia, that Bilger had been confined in the Elwyn Training School for mental defectives, and lacked mental capacity at the time of his trial; that upon his being pardoned and discharged from prison, he was committed to a mental hospital; and that his innocence had been established. Although the present members of this court had nothing to do with Bilger's case, there can be no doubt that defendant's statements to the police and his testimony before this court at the time he pleaded guilty established Bil-

ger's innocence and resulted in his pardon, as well as the clearing up of a number of crimes, the commission of which had been attributed by the police to other persons.

Also filed in support of defendant's rule for a new trial is an affidavit of one Joseph Broderick dated March 1, 1949, wherein it is set forth, inter alia, that late in November, 1936, he was arrested and taken to the police station at 28th and Oxford Streets; that he was held there for a period of "approximately 18 days to 3 weeks"; that during this time he was physically abused and constantly questioned by the police; that he finally "wrote and signed a statement confessing that he had murdered Police Officer James T. Morrow"; that "during the writing of such statement the police prompted him"; that he knew nothing of the murder of Morrow; that the statement was false, and made and signed by him as "a result of the brutal treatment he received at the hands of the police during the time he was held" at the police station; and that he "finally obtained the services of an attorney who effected his release from arrest almost immediately". Obviously, from the abuse of one prisoner in one station house by unidentified police officers, it cannot be inferred that defendant was physically abused in the Detective Bureau at City Hall by detectives who were identified and named. It is to be noted, however, that both Broderick and defendant confessed, but when Broderick obtained the services of an attorney, his release from arrest was effected, and although defendant's wife obtained an attorney for him and a writ of habeas corpus was filed, he was not released; from which the conclusion may be drawn that, unlike Broderick, defendant participated in the killing of patrolman Morrow and that his confession thereof was entirely voluntary.

It appears from the notes of the testimony presented at the coroner's inquest on the body of patrolman Morrow held on December 23, 1936, inter alia, that there were three gunshot wounds; that one bullet went in the back of the head, another went in the left side, and one entered in the thigh; that the "rapidly fatal wound" was the one in the back of the head, and that the cause of death was "gunshot wounds". There was nothing, of course, to indicate the order in which the wounds were received, except that, as the wound in the back of the head was "rapidly fatal", there is the possibility, if not the probability, it was not the first one inflicted. The force of the first of the three bullets, which were fired within six or eight feet, to hit Morrow may well have caused him to turn. In neither defendant's confession of February 23, 1939, nor in his statement to the police dated February 31, 1939, did he say that Morrow was shot "face on" or "from in front", as argued in support of the rule for a new trial. According to the former, it seems that he started to run before any of the shots were fired, although he saw the man fall, and in the latter, he said that the man started to speak, could not get the words out, dropped his flashlight, grabbed his stomach, and fell. At the trial, defendant testified that he did not know whether Morrow saw them or "just took a notion to flash the light back" —that he started toward them—that he "flashed the light, and the minute he flashed the light, it happened so fast that all I know is that Jack [Batton] had his two guns in his hands and was shooting"—that Morrow grabbed his stomach, tried to say something, could not get the words out, and fell. Morrow's grabbing his stomach indicates that he had then been hit by the bullet that went in his left side and not by the one that went in the back of his head, and that as he fell, he was struck by the one that went in the back of his head.

Whatever the sequence of the wounds, the coroner's physician, who performed the post-mortem examination, did not limit the cause of death to any one wound, but stated that was caused by "gunshot wounds". Accordingly, it is apparent that the contention that defendant's confession was inconsistent with the known facts is without merit.

Upon defendant's affidavit of destitute circumstances and request to assign counsel filed on March 24, 1939, the court immediately appointed two members of the Philadelphia Bar, Edmund G. J. Dale and Robert C. Duffy, to defend him, each of whom was fully qualified and competent to represent him without the assistance of the other. Able, experienced in the trial of civil and criminal cases, and courageous in protecting their client's interests, as evidenced by them during their many appearances before the judges of this court, their selection as counsel for defendant was assurance that everything that could be properly done in his behalf would be done. If he had repudiated his confession and informed them that he was not guilty, they would have requested the withdrawal of his plea of guilty and the continuance of the trial, which request the court would have granted as in many other cases, and then they would have prepared his defense and presented it before a judge and jury with the utmost vigor and ability. When, however, defendant adhered to his plea of guilty, and voluntarily took the stand and testified at the hearing before the three judges on March 29, 1939, the questions then put to him by his counsel showed their thorough familiarity with the case. It is unbelievable that he would not have told them, or that they would not have elicited from him, in consultation before trial, that his confession was not true, or that it had been obtained by improper means, because he was under fear generated by treatment to which he now claims he

was subjected more than a month previous. There was nothing in defendant's appearance or manner at the trial to indicate in any way that his confession had not been made voluntarily; to the contrary, his actual testimony and his demeanor while testifying clearly revealed his guilt and that he had been well treated by the police.

In Taylor v. Alabama, supra, it was stated, at page 271: "The petitioner's trial attorney has submitted no affidavit and has not appeared in the present proceeding." With this in mind, the two remaining members of the court, as originally constituted, requested counsel, who represented defendant at trial, to prepare affidavits or statements under oath setting forth their respective relations with him. Such a request by the court to a member of the Bar is tantamount to a command or order, and the responsibility therefor rests solely on the court. The case is now before the court on a rule for a new trial, and the court is entitled to all information that will be helpful in determining whether of right and justice a new trial should be granted or refused, even though such information may not be admissible at a trial. Also, by virtue of the oath taken upon admission to the Bar requiring "all good fidelity as well to the court as to the client", members of the Bar should aid the court in its search for the truth to the end that no injustice be done by either granting or refusing a new trial. After one of defendant's former counsel had filed his affidavit or statement, defendant's present counsel objected, and the filing of the other has been held in abeyance at the court's pleasure. In order, however, that the questions raised by the objection may not be or become involved in deciding defendant's rule for a new trial, such affidavits or statements have not been and will not be considered by the members of this court in the present proceeding.

Aside from defendant's confession of guilt contained in his statement to the police on February 23, 1939, he voluntarily took the stand at the trial on March 29, 1939, and admitted his guilt. He narrated what occurred when patrolman Morrow was shot and killed, supplying details not included in his statement to the police. He was then in the custody and under the protection of the court. He was entirely free from any possible abuse or any fear of reprisals by the police. Many other prisoners have repudiated prior confessions of guilt, pleaded not guilty, and stood trial before a jury, but this defendant renewed his plea of guilty, and his own testimony at the hearing before the three judges was such as to permit no doubt that he participated in the killing of patrolman Morrow and that he had not been ill-treated by the police. Obviously, at that time he was under no coercion or inducement other than to be truthful and honest in giving his testimony. Under such circumstances, there appears to be no justification for setting aside the judgment entered as a result of his own testimony given in open court.

The contention that defendant was not guilty of any crime in connection with the killing of patrolman Morrow has no merit. Although the shots that resulted in death came from a gun in the hands of Jack Batton, the latter and defendant had gone to the scene for the purpose of committing robbery, and, while awaiting a victim, they were interrupted by one of the police officers assigned to the vicinity to prevent such crimes. "The association with the felonious enterprise in such a manner . . . makes [defendant] equally responsible with [Batton] for the death of [Morrow] regardless of who fired the fatal shot." *Com. v. Oreszak*, 328 Pa. 65, 70.

As hereinbefore pointed out, the basis of a proceeding under the Act of 1903, supra, is after-discovered evi-

dence, but the evidence on which defendant relies in support of his motion for a new trial is *not* "such as could not have been obtained at the trial by the exercise of reasonable diligence." *Com. v. Sykes*, 353 Pa. 392, 400. If true, the testimony of defendant's friends Ferguson and Hazzlet, as to his being physically abused by the police after his arrest, was available to him, and the testimony of district manager Shackleford or another executive of the corporation, by which he was employed when he was arrested, as to the hours he was actually at work in New York before and after the time of the killing of patrolman Morrow, was available to his wife, who not only visited him a month before trial after engaging a lawyer to represent him but also was present in court at his trial. Such evidence, if true, was "obtainable by defendant and should have been offered at the time of trial." *Com. v. Fragassa*, 278 Pa. 1, 7. "All of this . . . evidence, if true, must have been known to [defendant] at the time of his trial but . . . he concealed it even from his own counsel. It is newly disclosed evidence, rather than newly discovered evidence." *Taylor v. Alabama*, supra, 265. The evidence submitted by defendant viewed in this light, however, is not sufficient to justify the court in disregarding his own statements to the police and in court at the trial on his plea of guilty before the three judges, for they were "so free in manner, detailed in content and affirmative in their nature that they carry obvious earmarks of being the truth". *Id.*, 268.

Accordingly, there appears to be no ground for substantial doubt as to defendant's guilt of murder of the first degree in killing of patrolman James T. Morrow. This court does not deem the grounds alleged in support of defendant's rule for a new trial sufficient to justify the granting thereof, but is of the opinion that of right and justice a new trial should be refused.

Rule for a new trial discharged.

Judge Crumlish concurred in the opinion and order.