## Commonwealth v. Harris

*Samuel Dash*, assistant district attorney, for Commonwealth.

*Herbert L. Maris*, for defendant.

BROWN, P. J., GUERIN and DAVIS, JJ., March 8, 1954.—This is a proceeding under the Act of April 22, 1903, P. L. 245, 19 PS §§861-63, for a new trial, nunc pro tunc, notwithstanding the expiration of the term in which defendant was convicted of murder of the first degree and sentenced to life imprisonment, based on the ground of after-discovered evidence.

The Act of 1903, provides, in section 1:

"Whenever by petition, supported by after discovered evidence, it shall be made to appear to the supreme court that there is ground for substantial doubt as to the guilt of any prisoner convicted of murder of the first degree, the said court shall have power to authorize the court of oyer and terminer in which such prisoner has been convicted to grant a rule for

new trial, nunc pro tunc, notwithstanding the expiration of term in which such prisoner was convicted and sentenced; and thereupon the said court of oyer and terminer may, in its discretion, grant and proceed to hear such rule, as in other cases".

On defendant's petition, the Supreme Court authorized the Court of Oyer and Terminer of Philadelphia County to grant a rule for a new trial nunc pro tunc. Defendant's motion and reasons for a new trial were filed in, and a rule for a new trial was granted by, the court of oyer and terminer, and the motion and rule were heard by this court, consisting of the three judges of the Court of Common Pleas No. 4 of Philadelphia of which the trial judge had been a member.

The Act of 1903 further provides, in section 2: "Upon the termination of the hearing of such rule, if the court of oyer and terminer shall not deem the grounds sufficient it shall thereupon discharge said rule and the proceedings shall terminate, and the judgment and sentence theretofore entered of record shall remain unaffected"; and, in section 3, "But if said court of oyer and terminer shall be of opinion that, of right and justice, a new trial should be granted, it shall set forth its opinion to that effect, and thereupon the prisoner may bring the opinion, together with the evidence, before the supreme court, as if upon appeal; and if the supreme court shall, after hearing, concur with the court of oyer and terminer that of right and justice a new trial should be had, it shall have power to authorize the court of oyer and terminer to make the rule for new trial absolute; and thereupon the case shall proceed in said court as if a new trial had been granted in due course, at the instance of the prisoner during the term."

It is thus apparent that if the court of oyer and terminer is of the opinion that a new trial should be granted, it cannot make the rule therefor absolute unless and until the Supreme Court concurs and au-

thorizes it to do so, but if the court of oyer and terminer discharges the rule, the proceeding is then terminated, for there is no appeal from such an order to the Supreme Court: Commonwealth v. Greason, 208 Pa. 126, 126-27; Commonwealth v. Gicere, 286 Pa. 296, 297; Commonwealth v. Del Vaccio, 303 Pa. 519, 521-25. In Commonwealth v. Greason, supra, 127, it was pointed out that the Act of 1903 "is an act which was required in the interests of justice where important subsequent developments in a case cast serious doubt on the justice of the conviction. . . . But it is manifestly intended for very exceptional cases, and the power conferred by it would readily be susceptible of abuse."

Mindful of the responsibility of finally terminating this proceeding or permitting the granting of a new trial after the lapse of over a quarter of a century, placed on the court of oyer and terminer by law, the judges who heard the motion and rule for a new trial have carefully considered the evidence presented at the trial and in this proceeding, and the applicable principles of law before coming to a conclusion.

From the evidence at defendant's trial on September 21, 22 and 23, 1926, it appears that on March 4, 1926, at about 2 a.m., defendant and a companion Wilbert McQueen, while walking north on Tenth Street, above Lombard Street, Philadelphia, were accosted by two policemen, Wilton Jones and Robert Fouche. All four men were armed. Defendant and McQueen drew their revolvers, and shots were exchanged by defendant and the two officers. No shots were fired by McQueen, who was killed in the shooting. The fatal bullet was a .38 caliber lead bullet with a copper, and nickel, jacket. Defendant and the police officers all had .38 caliber revolvers.

Officer Fouche testified to firing three or four shots, and that on the night in question his weapon was loaded with three lead and three metal jacketed bullets, but that he did not know which type he had fired.

Officer Jones stated that he had fired his revolver five or six times, but he did not know which type of bullet he had in his revolver the night of the shooting. Both officers said that three shots were fired from defendant's gun. On the other hand, defendant denied that he had discharged his weapon, and claimed that it was fired by Fouche, who picked it up from the street where he had thrown it. Defendant also testified that his cartridges were soft lead bullets, and that cartridges of the type of bullet extracted from McQueen's body were too long to fit in the chamber of his revolver; that it was impossible to close his revolver into firing position with such a cartridge. Various cartridges and shells, as well as the fatal bullet, were offered in evidence, but the live cartridges from defendant's revolver were not produced at the trial. The factual issues raised by the testimony were submitted to the jury in a clear and unequivocal charge. After reviewing the testimony as to the shooting, the trial judge said:

"Whose bullet was it that inflicted the fatal wound upon McQueen? That is the fundamental question in the case. If to that question you say it was not shot by the defendant, then the defendant must be acquitted. If that bullet was shot by anybody else, by either of the others of whose shooting we have evidence, then your verdict as to the indictment before you must be not guilty."

Later in the charge, after referring to the type cartridges and bullets in and discharged from the revolvers and suggesting to the jury to compare the bullets and to experiment with the fatal bullet, the empty cartridges and defendant's revolver, the judge stated:

"One of the questions, as I have told you, that you must decide before you can go any further in the case, is the question whether the defendant shot the bullet

which caused McQueen's death. Unless you are satisfied beyond a reasonable doubt that the bullet was discharged by him you must acquit him."

Officer Fouche testified also that defendant fired two shots at him, and one which struck Jones in the arm. Since only three bullets had been discharged from defendant's revolver and only one was alleged to have been fired in the direction of McQueen, whose body fell when Jones, who had hold of him, released his grip, it is possible that the jury concluded that the fatal bullet traveled through Jones' arm and then struck McQueen.

The jury rendered a verdict of guilty of murder of the first degree with the penalty of life imprisonment. Defendant's motion for a new trial was overruled, and on October 1, 1926, he was sentenced to the Eastern State Penitentiary in accordance with the verdict. No appeal was taken.

Some 20 years later, when application was made to the Board of Pardons for commutation of sentence, an assistant district attorney was instructed by the board to investigate whether the fatal bullet could have been fired from the revolver taken from defendant, and the question was referred to a ballistic expert of the Philadelphia Police Department. In his report the expert described the fatal bullet as a .38 caliber full metal patch bullet, that is, a bullet having a metal alloy jacket casing over the lead bullet core. The report stated, inter alia: "The total length of foreign, calibre 38 S & W (Special) Cartridge, from which fatal bullet had been fired, measures 1.539 inches, which would definitely not chamber in cylinder of revolver, exhibit (1)." Exhibit (1) was defendant's revolver at the time of the shooting. The report also stated:

"Microscopic comparative examination of fatal bullet, Exhibit (3), and test bullet fired from revolver,

Exhibit (1), has definitely shown that groove and land diameter specification are entirely dissimilar, showing conclusively that fatal bullet had not been fired from revolver, Exhibit (1), under examination."

Partly on the basis of this report, the Pardon Board recommended that defendant's sentence be commuted, and on July 25, 1947, he was released on parole for the remainder of his life. Subsequently, on January 17, 1951, after serving one year in the Philadelphia County Prison upon his conviction of assault and battery and carrying a concealed deadly weapon, he was recommitted to the Eastern State Penitentiary for violation of his parole. In 1951, application was again made to the Board of Pardons for reparole, but this was refused, the board instructing defendant's counsel to present the matter to the court.

A petition for a writ of habeas corpus was filed in the Court of Common Pleas No. 4, and after hearing at which evidence was presented, it was dismissed. On appeal, this order was affirmed: Commonwealth ex rel. Harris v. Burke, 374 Pa. 43. In holding that a writ of habeas corpus was not the appropriate remedy under the facts and circumstances presented, the court pointed out that defendant could institute proceedings under the Act of 1903, or request the Board of Pardons to recommend to the Governor to grant a pardon. Defendant then instituted this proceeding under the Act of 1903.

At the hearing in the present proceeding, it was stipulated by counsel that the evidence presented on the petition for a writ of habeas corpus filed by defendant in the Court of Common Pleas No. 4 and heard by the president judge of that court, be regarded and considered as presented in this proceeding. At that hearing, William B. Del Torre, ballistician in the Police Department of the City of Philadelphia, stated that he and George R. Spangler, who made the ballistic

report referred to above, started the ballistics laboratory in Philadelphia in 1930 and that the first such laboratory was started in New York City in 1929. According to his testimony, prior to the time when fixed ammunition was manufactured by various companies, each shooter had his own mold and made his own ammunition, and from the weight and size of the bullet it could be determined whose bullet it was, and then when fixed ammunition was manufactured, there was some ballistics, but the subject lay dormant from 1885 to 1920, when ballistics commenced to be recognized as a science, that is, the determining of the gun that fired a bullet by means of the markings left inside the barrel which are imprinted on the bullet. He said also that the science was in its infancy in the latter part of the 1920's; that at the time of the trial of this case in September 1926 there was no general knowledge of the science, and that it was not until the 1930's that ballistics featured in cases. He identified and supplemented Spangler's report, which was offered and accepted in evidence.

As hereinbefore noted, the basis of a proceeding under the Act of 1903 is after-discovered evidence.

"To entitle a defendant to a new trial on this ground the evidence must have been discovered since the trial; and be such as could not have been obtained at the trial by the use of reasonable diligence; it must not be simply corroborative or cumulative, or merely to impeach the credibility of a witness; and it must be such as would likely result in a different verdict if a new trial were granted": Commonwealth v. Mellon, 81 Pa. Superior Ct. 20, 25; Hornick et al. v. Bethlehem Mines Corporation, 310 Pa. 225, 228; Felo et al. v. Kroger Grocery & Baking Company, 347 Pa. 142, 146; Brannagan v. Great Atlantic & Pacific Tea Co., 352 Pa. 18, 20-21. Also Commonwealth v. Moskovitz, 142 Pa. Superior Ct. 325, 326; Commonwealth v. Krick, 164

Pa. Superior Ct. 516, 519. The evidence submitted in the present proceeding appears to comply with these well settled requirements.

Apparently there were no ballistic experts available to testify at the time of defendant's trial in 1926; indeed, it was not until four years later that one was employed by the City of Philadelphia. Hence, the testimony of such an expert can properly be regarded as evidence "such as could not have been obtained at the trial by the exercise of reasonable diligence": Commonwealth v. Sykes, 353 Pa. 392, 400. Clearly, it was not "easily obtainable by defendant . . . at the time of the trial": Commonwealth v. Fragassa, 278 Pa. 1, 7. Indeed, it "could not have been . . . produced at [defendant's] trial": Commonwealth ex rel. Harris v. Burke, supra, 47.

The testimony of the ballistic expert is not "simply corroborative or cumulative, or merely to impeach the credibility of a witness". In a sense, it is repetitive of and strengthens defendant's testimony that the fatal bullet was not and could not have been discharged from his revolver, and it also challenges or discredits the testimony of other witnesses indicating that defendant fired the fatal shot, but it goes further and enlarges the scope of the evidence by supplying other facts material to defendant's guilt or innocence different from those appearing in the evidence at his trial. While the jury was instructed by the trial judge to experiment with the fatal bullet, the empty cartridges and defendant's revolver which were in evidence, there was no evidence showing the actual measurements of the fatal bullet, the fired cartridge cases, and the cylinder and barrel of defendant's revolver, or the testimony of a ballistic expert to help them in their examination. His testimony furnishes such facts and assistance, and also discloses that his microscopic comparative examination of the fatal bullet and the

test bullet fired from defendant's revolver shows that the fatal bullet had not been fired from this revolver. Facts as well as the expression of opinion appear in his testimony, but this evidence is different from that presented at the trial not only in degree but also in substance.

Although the weight to be given to the "testimony of the ballistic expert must necessarily be a question for the jury if a new trial . . . be had" (Commonwealth ex rel. Harris v. Burke, supra, 47), this evidence appears to "be such as would likely result in a different verdict" if presented at another trial of this case, that is, in a verdict other than guilty of murder of the first degree. As stated in Commonwealth ex rel. Harris v. Burke, supra, 45, in referring to the instructions of the trial judge quoted above to the effect that defendant must be acquitted unless he fired the fatal bullet, "this obviously was a correct statement, *at least as far as murder in the first degree was concerned*, inasmuch as there was no claim on the part of the Commonwealth that at the time of the shooting [defendant] and McQueen were, or had been, engaged in the commission of any of the felonies enumerated in the criminal code as bearing on the question of first degree murder". (Italics supplied.)

At a retrial, proof might be presented, however, to permit a verdict of guilty of murder of the first degree, or a new trial might result in a verdict of guilty of murder in the second degree, under principles of law pertaining to the subject of proximate cause in criminal cases, e.g., such as are set forth in Commonwealth v. Almeida, 362 Pa. 596, 603 to 635. In the event of a verdict of guilty of second degree murder, the imposition of the maximum sentence for that crime would probably be followed by defendant's discharge from imprisonment by virtue of the provisions of the Act of May 28, 1937, P. L. 1036, 19 PS §894. There

is also the possibility of a verdict of not guilty. Of course, in the present proceeding, the question for determination is not whether defendant is guilty or innocent, but whether a new trial should be granted.

In Commonwealth ex rel. Carey v. Montgomery County Prison Keeper, 370 Pa. 604-06, where defendant was convicted of murder in the first degree with the penalty fixed by the jury at death for the killing of a police officer, whose death was caused by gun shot wounds while he and another police officer were pursuing defendant from a burglary in order to arrest him, a petition "to invoke the extraordinary aid" of the Act of 1903 was refused by the Supreme Court, because the "allegations of after discovered evidence were wholly insufficient, even if proven, to constitute evidence of such quality and therefore could not raise substantial doubt as to guilt". The "sole evidence" relied upon for a new trial was the testimony of a ballistic expert to contradict the evidence of the Commonwealth ballistic expert at the trial that "the fatal bullet could not have come from the policeman's gun". It was stated in the opinion that defendant's "counsel, *at trial,* attempted by cross examination to contradict the Commonwealth's expert testimony that the two types of guns required different size cartridges. In addition to the vigorous cross examination [defendant's] counsel went so far as to try to force the regulation cartridge into the special revolver offered in evidence. The evidence now belatedly sought to be adduced would be but the further attempt at contradiction".

At the time of the trial of that case, the testimony of a ballistic expert could have been produced by defendant and was, in fact, produced by the Commonwealth, whereas in the present case such testimony was not available to the Commonwealth or defendant. Accordingly, it is apparent that the ruling in that case

is not determinative of the question before the court in this proceeding.

This is a "very exceptional" case, wherein "important subsequent developments . . . cast serious doubt on the justice of the conviction": Commonwealth v. Greason, supra, 127. The advancement in the knowledge and science of ballistics and the coming of experts on the subject since the trial make available evidence that was not then obtainable, and which is of such character as to satisfy the requirements for the granting of a new trial to defendant on the ground of after-discovered evidence.

Therefore, the court of oyer and terminer is "of opinion that, of right and justice, a new trial should be granted".