Alexander Del Giorno, J.
This is a claim to recover damages for personal injuries sustained as a result of the alleged negligence of the State.
*809 On July 3, 1953, the infant, then of the chronological age of 9 years, was adjudged a mental defective by order of Honorable Maximilian Moss, then a Justice of the Supreme Court, Kings County, and was certified to Willowbrook State School. In the history obtained by the certified examiners, upon which the order of the court was based, it appears that the boy, who had come to the United States from Puerto Rico in 1952, was emotionally unstable, inadequate, that his conduct disturbance was truancy and running away from home and that he suffered the neurotic trait of nightmares. A mental age of 6 years 11 months and an I. Q. score of 70 were indicated, and he was classified as a “ mental defective borderline ’ \ Institutional care was recommended because he could not be cared for at home, since his aunt, under whose management he had been for the preceding year, worked during the day and was unable to give him sufficient supervision and to fulfill his emotional needs, particularly because he ran away continually and was a chronic truant from school.
The infant was admitted to Willowbrook State School on July 23, 1953. Shortly thereafter, and on August 26, 1953 and August 27, 1953, he was subjected to a psychological examination. On the Arthur Point Scale Test he attained a mental age of 7 years and 7 months, and an I. Q. score of 78, which indicates borderline intelligence. The I. Q. score was estimated, because his exact chronological age was unknown. On the Stanford-Binet Form “ M ” Test, he received the mental age score of 5 years 1 month, and an I. Q. score of 52, estimated. The examiner noted that this I. Q. score was due probably to the foreign language handicap. On the Groodenough Test, which is a drawing test of intelligence, he received the mental age score of 8 years 3 months. The report stated that it seemed probable that the boy was relatively unstable and might even harm himself at times.
Dr. Harold Berman, the director of the school, testified that a mentally defective child is one who needs care and supervision and that it is the purpose of Willowbrook to provide such care and supervision to those children sent to it. He stated that the school officials determine by present standards of knowledge what is necessary for each patient, based upon his capacity; that patients of like capacity are assigned to the same ward, the number of guards assigned to a group being one or two although those in charge of particular wards can increase or decrease personnel depending on activities. He said that the infant was capable of caring for himself in the way of eating, dressing and toilet and was assigned to Ward 0 in Building 5, where *810 the patients are of the highest type boys and where the supervision is comparatively slight, the purpose of the school in their case being to instill self-confidence in the boys in order to inspire them to act on their own behalf. He admitted in so many words, however, that upon the date of the accident hereinafter described, the infant was a mental defective in need of care and treatment.
The infant had been assigned to Ward 0 on the upper floor of Building 5 at the school. This ward consisted of 8 rooms, including a day room and a clothes room, separated from each other by a corridor 34 feet in length. Shortly before noon on April 4, 1955, the boy was working alone in the clothing room, waxing the floor. He had removed his shoes while doing so, as was the custom, and when he had finished the waxing, he testified that he sat on the window sill in the room to put on his shoes, because there were no chairs in the room. Both sides agree that the window sill was 3 feet from the floor and 18 inches in width. He leaned against the screen in the window frame and it fell out and with it he also fell out the window.
The witness Saif elder, an attendant attached to Ward C, Building 5 at the school, was in charge of the ward on that day. His duty was to take care of the children, to see that they were fed, washed and properly attended to, after which they were taken to school and then returned to the ward by an attendant from the school. Such of the children as were “ honor card ” patients were allowed out alone, but the infant herein was not such a patient. He testified that he watched over his wards, controlled them and cautioned them to stay off the window sills; that daily he inspected the wards generally and on occasion the windows and the screens, and with respect to the latter, that he made a visual inspection of the screens to see if there were any rips or tears in them, and that he pressed his hand against them to see if they were unhooked. If there were any defect, he made a report at once and the condition was remedied forthwith. He claimed that on the day in question, the windows were opened from the top, although he said there were times when windows were opened from the bottom. They were never locked. He saw the infant waxing the floor. He told Doyle, an attendant in the day room on the other side of the corridor, that he was going to the office to answer the phone, and left the ward. During his absence the infant fell out of the window. He heard about the accident when he was in the superintendent’s office, within less than 10 minutes after his arrival there.
The witness Doyle testified that he worked in Ward C, 25 feet above the ground, on the day of the accident, that he was in *811 the day room with 50 children at the time of the accident, and that 20 more were working in the ward. He had told the infant claimant on a previous occasion to get off the window sill, on which he had been sitting. He said that Salfelder had been called out of the ward, that he was told by a patient five seconds later that the claimant had fallen, that he ran into the clothing room, saw the screen off and ran outside. He described the screen as being of wood, with wire mesh, that on the side it had two wing nuts, and that two hooks were set on the top and on the outside of the screen window frame. He termed it an insect screen, similar to those in use in the average home. He could not recall whether the window was open or closed, but said that to prevent a patient from jumping out of the window, it was opened usually from the top.
Dr. Lazar, assistant director, testified that shortly after the accident he saw the screen on the ground and that the frame had been broken. He did not know whether or not the outside hooks were broken.
The injuries sustained by the infant were two lacerations of the scalp requiring 12 stitches, and a healing fracture of the right parietal bone. Dr. Berman testified that there might have been pain associated with the injury. The boy was on the critical list for 10 days, after which, time he was returned to his normal activities in the ward. Dr. Lazar stated that his having been on the critical list did not mean necessarily that he was in a critical condition at any time, but rather that placing him on such list was a precautionary measure.
At the end of claimant’s case, the State moved to dismiss the claim upon the ground that the claimant had failed to make out a prima facie case. The State then rested and moved to dismiss upon the entire case.
A determination as to the liability of the State must be predicated upon the question of whether or not the State has exercised that degree of care which is required by the standards established by the State in the circumstances prevailing herein.
In a well-written and informative brief, the State suggests that the care required of the State should be that standard of care required to be given a child by his parent, and points out that in the exercise of discretion as parents and in the performance of duties imposed by law, parents are held to no higher standard of care than the measure of their own physical, mental and financial abilities, to provide for the well-being of their child; the State also stresses the possibility that, if a parent may be subjected to a suit for damages for each failure to exercise care commensurate with the risk, for each injury *812 caused by inattention, unwise choice or even selfishness, a new and heavy burden will be added to parenthood. The State contends that a parent has never been charged with the duty of exercising constant surveillance over his child to a point where the parent was obligated to have his children in his presence at all times, or incarcerated by window guards and locked doors, merely to prevent injury to the child. The State claims that to place a child under such restrictions and limitations would defeat the purpose of placing him in an institution for rehabilitation, the purpose of which is to restore its patients to their useful and rightful place in society. The Willowbrook School is an open institution, without walls or bars, for the treatment, care and training of its charges.
In support of its contention, the State relies heavily upon Excelsior Ins. Co. of N. Y. v. State of New York (296 N. Y. 40). In this case, one Flood, an 18-year-old moron, escaped from the Wassaic School, a public institution for the care and treatment of mental defectives. Coming upon a nearby lumberyard, he entered an unlocked barn owned by one of the claimants in this case. Using matches he had taken with him, he built a fire in a bucket, and, when sufficiently warmed, resumed his flight, first turning the bucket upside down in the belief that that was the way to put out the flame. Damage resulted. Flood had escaped previously from another State school, and once or twice before from Wassaic. He was a high grade moron with an I. Q. of 66, and a mental age of 10% years. There was no evidence that he had any criminal tendencies or that he had ever before caused injury to person or property. The court held (p. 44) that “ Toward the inmate Flood, the State had a ‘ quasi-parental power ’ — bound, Sir Frederick Pollock has observed, to use more diligence in informing itself what treatment was proper for him than a parent would be bound to use. (Pollock on Law of Torts [new American ed., 1894], pp. 150-151.) So far as third persons were concerned, though, the State stood in loco parentis. (Cf. Restatement, Torts, §§ 316-317.) The State owed the community, the outside world, no greater duty than would parents under similar circumstances.”
The court further held (pp. 44-45) that, “No hazard being apparent, Flood’s act cannot render the State responsible for the resulting damage. As Chief Judge Cabdozo phrased it in Palsgraf v. Long Island R. R. Co. (248 N. Y. 339, 344): ‘ The risk reasonably to be perceived defines the duty to be obeyed ’ Stating that regulations of the State Mental Hygiene Department require that the authorities lock up all matches, search clothing of patients for prohibited articles and keep elopers *813 under close and constant observation, the court pointed out (p. 45) that “ From that standpoint, the State may have been negligent in not assuring compliance with the regulations and in not making certain that the boy did not elope. But such conduct, while perhaps a wrong in relation to its ward and to the institution itself, could not be regarded as a wrong to the community or to third persons, such as claimants herein. Even if the State acted negligently with respect to Flood or the institution, that fact does not entitle claimants herein to sue ‘ as the vicarious ’ beneficiaries 'of the breach of duty owed to others. (Palsgraf v. Long Island R. R. Co., supra, p. 342.) ”
The court found (p. 45) the State not to be liable, holding that “ The authorities at Wassaic could not reasonably have anticipated — from his history of harmless elopements — a Flood likely to set fires, or otherwise dangerous, while at large. That being so, and since the boy was neither insane nor criminal, it owed no duty to claimants or other members of the outside world to guard him closely or to see to it that he did not leave the institution.”
The Excelsior case is not analogous to the case at bar. There the damage was caused by an eloper from a State school to the property of third persons in no way connected with the school. Here, the personal injury was suffered by a boy who had been entrusted to the care of the school and who was injured while he was in the school. The distinction between the two, as above set forth, was enunciated clearly in the majority opinion.
The State cites other cases to like effect, none of which applies to the facts involved in the instant case, nor to the principles of law involved therein.
The State urges, just as it did in the Excelsior case, where the facts were different, that to hold the State liable for the injuries sustained by the infant would be the same as holding the State liable if the infant had sustained injuries as a result of falling while descending steps, two at a time, or where he sustained injuries while engaging in recreational activities, such as climbing trees and fences, that then “ the State would have to bar all its windows, remove all its trees, install runways rather than staircases, and remove all its fences, so as to avoid liability ” and that the “ only means by which the State could comply with this obligation to the infant claimant would be to place him in a cubicle for his entire stay at the institution.” With these extreme conclusions the court most certainly cannot agree. If the State is remiss in its duty to provide such supervision, it is no answer on the part of the State for such failure to say that if a person is injured as a result, the only solution *814 is to place the patient under lock and key for the remainder - of his stay at the- school. Such an inference is manifestly unwarranted. '
Without question, the infant was left unattended, although the director testified that at least one and sometimes two attendants should he present in the ward. While the absence of 'Salfelder, supervisor on that day, left Doyle the only attendant on duty on the floor, the latter was at least 34 feet away in another room, where he could not see the infant. The State violated its standard of care. Dr. Berman, the director, testi-fied that on the date of the accident, the infant was a mental defective in need of care and treatment. It was the duty of the school to afford him every reasonable care to protect him from injury. (Scolavino v. State of New York, 187 Misc. 253.) The degree of care to be exercised is measured by the patient’s ailment as known to the school. (Shattuck v. State of New York, 166 Misc. 271, affd. 254 App. Div. 926; Martindale v. State of New York, 269 N. Y. 554.) The witness Doyle testified that usually the bottom half of the windows in the ward were left shut to prevent patients from falling out of the windows, and if the bottom half of the window in the clothes room had been so shut, this accident would not have happened. The State had reason to anticipate the occurrence of an accident such as this, especially since Doyle had told the infant on a previous occasion to get off the window sill, to which must be added the fact that there were no chairs or benches in the room, and the only thing affording such necessity to enable him to put his shoes on, after having waxed the floor, was the window 'sill. There is no evidence that the screen involved in the accident was anything but an ordinary house screen, with the usual thickness of the wire, and evidently not hooked properly, for the whole screen fell.
Under all of the circumstances, the court is of the opinion that the State has failed to exercise reasonable care toward the infant claimant herein. (Tabor v. State of New York, 186 Misc. 736; Dimitroff v. State of New York, 171 Misc. 635.) The State failed to take necessary precautions against those risks reasonably to be perceived (Palsgraf v. Long Island R. R. Co., supra) and was, therefore, negligent.
The court finds that the infant claimant is entitled to the sum of $2,500 for personal injuries sustained by him.
All motions made by the State on which decision was reserved are hereby denied.
This constitutes the decision of the court pursuant to the provisions of section 440 of the Civil Practice Act.
Enter judgment accordingly.